# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    v.

RONALD T. SPOOR,

        Defendant.



**REPORT AND**
**RECOMMENDATION**
**13-CR-6059**

## Preliminary Statement

On April 11, 2013, defendant Ronald T. Spoor (hereinafter Spoor or defendant) was indicted on six counts of production and possession of child pornography.  See Indictment (Docket # 6).  Currently before the Court[1] are motions by the defendant to suppress statements allegedly made to New York State Police on December 6, 2012 and to Homeland Security agents on December 21, 2012.  See Docket # 18.  The Government has filed papers in opposition to the motions.  (Docket # 19).  A suppression hearing was held before this Court on three separate days.[2]  Thereafter, the parties filed post-hearing briefs. See Docket ## 53, 59.  The following is my Report and Recommendation as to the defendant's motion to suppress.

---

[1]  By Order of United States District Judge Charles J. Siragusa, dated April 11, 2013, all pretrial motions have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)—(B).  (Docket # 7).

[2]  The transcript from the June 18, 2014 hearing is hereby referred to as Tr. A.  See Docket # 38.  The transcript from the July 9, 2014 hearing is referred to as Tr. B.  See Docket # 37.  The transcript from the August 4, 2014 hearing is referred to as Tr. C. See Docket # 36.

### Findings of Fact

The events giving rise to Spoor's suppression motion occurred on December 6, 2012 and December 21, 2012.

I. December 6, 2012: On December 6, 2012 New York State Police Investigator George Gerbic interviewed the defendant. Investigator Gerbic testified that on that date he received a referral from the New York State Department of Social Services "which indicated that a[n] 8-year-old child was sexually touched by a 49-year-old male," identified as Spoor. Tr. B at 6. Accompanied by Lori Rouse, a New York State Child Protective Services Case Worker, Investigator Gerbic drove to the defendant's residence at 1486 Gassner Road in Waterloo, New York in order to try and speak to Spoor. Tr. B at 7—8. Investigator Gerbic and Ms. Rouse arrived at Spoor's residence at approximately 4:30 p.m. Tr. B at 6. Investigator Gerbic was wearing "business attire" with no clothing identifying him as law enforcement, and he had no weapon visible. Tr. B at 7.

Upon arrival, Investigator Gerbic knocked on the door, and the defendant answered. Tr. B at 8. Investigator Gerbic told Spoor that he was "investigating a child abuse complaint and asked if he would mind talking to me." Id. Spoor agreed to be interviewed. Id. Investigator Gerbic asked Spoor if he would accompany them to the New York State Police barracks for the interview, and the defendant agreed. Tr. B at 9—10. On the ride to the barracks, Spoor

2

sat in the front seat of Investigator Gerbic's unmarked black Ford Fusion and Ms. Rouse sat in the rear passenger side of the vehicle. Tr. B at 10. Spoor was not handcuffed or restrained in any way. Tr. B at 12—13. Investigator Gerbic drove to the police barracks in Waterloo, and during the seven minute drive, Investigator Gerbic and the defendant made "small talk" not related to the investigation. Tr. B at 11.

After arriving at the barracks, Spoor, Investigator Gerbic, and Ms. Rouse went to Investigator Gerbic's desk area. Tr. B at 12. Investigator Gerbic, Ms. Rouse, and Spoor sat around Investigator Gerbic's desk, with the defendant seated directly across from Investigator Gerbic. Id. Investigator Gerbic testified that Spoor was "calm and cordial" and did not appear to be under the influence of drugs or alcohol. Tr. B at 12—13. During the course of the interview, Investigator Gerbic told Spoor that two children had made allegations that he had sexual contact with them, and Spoor denied the allegations. Tr. B at 14. Investigator Gerbic asked Spoor whether he "would be open to taking a polygraph," and Spoor said he would. Id. Because a polygraph operator was not available at the State Police barracks in Waterloo, Investigator Gerbic, Ms. Rouse, and the defendant drove forty minutes to the State Police barracks in Canandaigua, New York. Tr. B at 14—16. Upon arriving at the barracks at approximately 7:00 p.m., Spoor sat in the unsecure lobby

3

area while Investigator Gerbic and Ms. Rouse spoke to the polygraph operator, New York State Police Investigator Tom Crowley.  Tr. B at 17.

Spoor was then escorted to the "polygraph suite" by Investigator Crowley at approximately 8:00 p.m.  Tr. B at 18—19.  Between 8:00 and 9:00 p.m., Investigator Crowley obtained biographical information from Spoor and explained "the ground rules of polygraphs."  Tr. B at 41.  During this period, Investigator Crowley also went over a form entitled "Miranda Rights" with Spoor.  Tr. B at 22—23; see also Government Exhibit 1.  Unlike a typical advice of rights card, Investigator Crowley used a form containing a series of ten questions which he posed to the subject of the interview.  Id. For example, instead of advising the defendant of his right to a lawyer, the form prompts the law enforcement officer to ask the suspect, "What will happen if you can not afford an attorney and you want one?"  Id.  The form contains a space under each question where either the suspect or the law enforcement officer records the suspect's answer to each of the ten questions.  Id.  Some of the questions have little, if anything to do with Miranda rights, for example, the suspect is asked whether he or she realized that the law enforcement officer might be required to testify about what the suspect has said in the interview and, if that happens, asks the suspect, "Would you want me to tell the truth or would you want me

4

to lie?"  Id.

Investigator Gerbic testified that he heard and observed Investigator Crowley go over the "Miranda Rights" form with Spoor. Tr. B at 42.  According to Investigator Gerbic, Spoor mentioned that he did not read or write very well, so Investigator Crowley wrote Spoor's answers to each of the ten questions on the form.  Tr. B at 45.  Investigator Gerbic testified that he watched Investigator Crowley administer the polygraph test, and Spoor again denied any criminal conduct.  Tr. B at 47.  The polygraph test ended at approximately 10:00 p.m.  Id.  After the test was completed, Investigator Crowley left Spoor alone in the polygraph suite and spoke privately with Investigator Gerbic for about ten minutes.  Tr. B at 48.  Investigator Crowley told Investigator Gerbic that the test results were "inconclusive."  Id.  However, Investigator Crowley told Investigator Gerbic that he was going to deliberately deceive Spoor by telling him that he "did not pass" the polygraph, apparently in the hope that it would prompt an admission, and Investigator Gerbic agreed with this strategy.  Tr. B at 48—49.  Investigator Crowley then went back in the polygraph suite and told Spoor that he did not pass the polygraph test.  Tr. B at 49.

Investigator Crowley continued to question Spoor for about thirty more minutes.  Tr. B at 50.  It was at this point in their encounter that Spoor made admissions about molesting children.  Id.

5

Although not present in the "polygraph suite," Investigator Gerbic observed and listened to the admissions through the one-way observation window.  Id.  The admissions were made at approximately 10:45 p.m.  Id.

Once the admissions were made to Investigator Crowley, Investigator Gerbic obtained an audio recording device and re-interviewed Spoor while Spoor was still seated in the polygraph suite.  Tr. B at 24.  The interview was recorded (Government Exhibit 2) and lasted approximately twenty minutes.  Id.; Tr. B at 54. Investigator Gerbic did not advise Spoor of his Miranda rights before beginning his interview but rather asked Spoor to confirm that he had already been given Miranda rights, and Spoor acknowledged that he had.  Tr. B at 60.  During the interview by Investigator Gerbic, Spoor made additional inculpatory statements about sexually molesting two children.  Tr. B at 30.  Once Investigator Gerbic's interview was finished and paperwork completed, Investigator Gerbic and Ms. Rouse drove Spoor back to the Waterloo barracks where Spoor was formally placed under arrest and processed.  Id.

II. December 21, 2012: On December 19, 2012, Investigator Gerbic informed Homeland Security Investigation Special Agent Karen Wisniewski about the State Police investigation of Spoor.  Tr. A at 5—6.  Agent Wisniewski had been working as a special agent with Homeland Security for approximately fifteen and a half years and was

6

then assigned to the Cyber Crimes Child Exploitation Unit.  Tr. A at 5.  Investigator Gerbic told Agent Wisniewski that the state police had seized photographs from Spoor that they believed constituted child pornography.  Tr. A at 5—6.  Agent Wisniewski and Investigator Gerbic met on December 21, 2012, and Agent Wisniewski reviewed the suspected illegal child pornography images.  Tr. A at 6—7.  Thereafter, Agent Wisniewski, along with Special Agents Matthews and Williams, decided to go to Spoor's residence to conduct what they described as a "knock-and-talk" at the defendant's parents' residence at 38 Dezeng in Clyde, New York.  Tr. A at 8.

The agents arrived at the residence at approximately 10:00 a.m. on December 21, 2012.  Tr. A at 8—9.  Spoor answered the door, and the agents identified themselves and asked if they could speak with him.  Id.  According to Agent Wisniewski, Spoor stated that "he was fine speaking with us and he invited us into the residence."  Tr. A at 9.  The agents entered the home, and Agents Wisniewski and Williams sat with the defendant at the kitchen table while Agent Matthews spoke to the defendant's parents in the living room.  Id. The agents were "dressed down" in casual clothing and without any visible weapons, and at no point was Spoor handcuffed or restrained. Tr. A at 11—12.  Agent Wisniewski specifically told Spoor that he was under no obligation to speak with them, and if he wanted to stop talking "he could let us know and we would stop asking him questions."

7

Tr. A at 13.   After telling Spoor that they wished "to speak to him regarding a potential child pornography possession case," Spoor "became quite agitated" and began talking about the molestation charges filed by the State Police.   Id.   Agent Wisniewski testified that she interrupted Spoor and told him that "was not why we're here to talk to you today."   Tr. A at 13—14.   Agent Wisniewski told Spoor that they "had some pictures that we wanted him to take a look at and that we also wanted to talk to him about child pornography issues."   Tr. B at 14.   According to Wisniewski, Spoor "calmed down immediately" and thereafter was "social, cordial, [and] calm."   Id.

The agents interviewed Spoor for approximately forty-five minutes.   Id.   Agent Wisniewski testified that Spoor did not appear to be anxious or upset during the interview, did not appear to have difficulty understanding the agents, did not ask the agents to leave, did not suggest that he did not want to talk, and answered the agents' questions freely.   Tr. A at 14—15.   Spoor agreed to look at the images the agents brought with them, and he answered questions about the images.   Tr. A at 16.   Agent Wisniewski stated that the agents never asked Spoor any questions relating to the state child molestation charges or investigation.   Tr. A at 15—16.   At approximately 10:50 a.m., the agents' interview of Spoor ended and they left.   Tr. A at 16.

On cross-examination, Agent Wisniewski testified that Spoor was

8

never asked whether he was represented by counsel on the molestation charges, and the agents never advised Spoor of his Miranda rights. Tr. A at 20, 23—24. Agent Wisniewski testified that the agents did not "seek" any statements from Spoor regarding the molestation case and never followed up any information he provided on the molestation charges. Tr. A at 30. Agent Wisniewski stated that when Spoor began talking about the molestation case, she cut him off "in the middle of his statements," and those statements were "very quick" and only lasted approximately fifteen seconds. Tr. A at 28, 30—31.

III. Defense Evidence: After the government finished its proof, the defendant testified. Spoor testified that he graduated from Clyde Savannah High School, where he "barely passed" with "low honors and stuff," and he went through BOCES to learn welding. Tr. C at 8. Spoor stated that his reading and writing skills are "[n]ot very good." Tr. C at 9.

Spoor then recalled his arrest on state charges. He stated that after he was arrested on December 7, 2012, he was taken to Waterloo Town Court, where he was arraigned on a charge of criminal sexual act in the first degree. Tr. C at 4—5. Spoor requested assigned counsel and was remanded to jail. Tr. C at 5. On December 13, 2012, Spoor appeared a second time in Waterloo Town Court, this time with an attorney from the Seneca County Public Defender's office. Tr. C at 6—7. Spoor testified that he was released from custody shortly

9

thereafter, and about two weeks after he was released from state custody, he was interviewed by agents from Homeland Security at his parents' house.  Tr. C at 7—8.  The agents identified themselves and asked if "they could speak to me."  Tr. C at 10.  Spoor testified that he invited them into the residence, they sat down around the kitchen table, and the agents began asking him questions.  Id. Spoor testified that he thought the agents came to ask him questions about "the abuse to the kids" and the agents never stated otherwise. Tr. C at 10—11.  Spoor recalled the agents asking about the alleged victims of abuse, but he testified that the agents never asked him about having an attorney on the state court charges.  Tr. C at 12, 14—15.

On cross-examination Spoor testified that he could not recall whether the agents who interviewed him on December 21, 2012 told him they were there to talk about a child pornography investigation.  Tr. C at 16.  Spoor did recall being shown "blurry pictures" and being asked if he could identify the children in the pictures.  Id.  Spoor also recalled being asked about his use of computers and search terms related to child pornography.  Tr. C at 16—17.  Spoor testified that he denied to the agents any use of a computer to download child pornography.  Tr. C at 17—18.  Spoor agreed that he never told the agents that he had an attorney or that he did not want to talk to them.  Tr. C at 18.  Spoor claimed that he did not understand what

10

the agents were talking to him about and testified, "They explained themselves to me several times and I did not understand what was going on."   Tr. C at 22.

## Discussion

Spoor seeks to suppress the statements he made to law enforcement on December 6, 2012 and December 21, 2012.   See Defendant's Motions (Docket # 18).   He argues that his December 6, 2012 admissions to New York State Police Investigators were both involuntary and the result of defective Miranda warnings.   See Defendant's Post-Hearing Submission (Docket # 53).   As to the statements he made on December 21, 2012 to Homeland Security agents, Spoor argues these statements were involuntary.   Id.

## I.   December 6, 2012 Statements to New York State Police

A.   Defective Miranda Warnings: The government seeks to use statements Spoor made to New York State Police Investigators Crowley and Gerbic after Spoor was placed in the polygraph suite on December 6, 2012.   For purposes of this Report and Recommendation, the Court will assume that Spoor was in custody at the commencement of the polygraph examination and thus entitled to Miranda warnings before Investigators Crowley and Gerbic interviewed him.   See Miranda v. Arizona,   384   U.S.   436,   444   (1966)   (defining   "custodial

11

interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.").

Investigator Crowley's unique ten question "pop quiz" method of advising a suspect of their Miranda rights is problematic in that it simply invites the litigation this Court now faces.[3]  Be that as it may, the Supreme Court has made clear that the "rigidity" of the Miranda requirement does not extend "to the precise formulation of the warnings given a criminal defendant." California v. Prysock, 453 U.S. 355, 359 (1981) (per curiam) ("Miranda itself indicated that no talismanic incantation was required to satisfy its strictures."). What Miranda does require is that a suspect in custody "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Miranda, 384 U.S. at 479.

After examining the ten questions contained on Investigator Crowley's Miranda rights "quiz" and the answers given by Spoor, I conclude that the defendant was adequately advised of the rights afforded him under Miranda. See Government Exhibit 1.  Regarding

---

[3]  Investigator Crowley might be well served by just advising a subject of Miranda rights by utilizing the normal advice of rights form that is used by virtually every law enforcement agency in the United States.

12

the right to remain silent, the form asked, "Do you have to answer even one of my questions or say anything at all to me?" and the defendant responded, "No." Id. The form also asked, "What if you start to answer my questions and then you want to stop, can you stop any time you want to?" and the defendant responded, "Yes." Id. Regarding statements being used against him in a court of law, the form asked, "Do you realize that if I am called into court to testify about what both you and I said in here today, I will be placed under oath to tell the complete truth?" and the defendant responded, "Yes." Id. The form also asked whether the defendant would want the investigator to tell the truth or lie, and the defendant wrote, "Tell the truth," and when asked whether he realized that the investigator would tell the complete truth regardless of who it helped, the defendant responded, "Yes." Id. Regarding the right to the presence of an attorney, the form asked, "When can you have an attorney?" and the defendant responded that he could have an attorney "now." Id. The form then repeated asking whether the defendant could have an attorney at any time, "including right now," and the defendant responded, "Yes." Id. Regarding the appointment of an attorney prior to questioning if the defendant could not afford one, the form asked, "What will happen if you can not afford an attorney and you want one?" and the defendant responded, "I'll be appointed one." Id. The form also asked, "Can you use my telephone — free

13

of charge — to call an attorney any time you want to?" and the defendant responded, "Yes." Id. At the end, the form asked whether, knowing all his rights, he wished to continue, and the defendant responded, "Yes," then signed his name. Id.

Although unnecessarily convoluted, the use of this form adequately informed the defendant of his constitutional rights under Miranda and provides the basis for the Court to conclude that Spoor understood those rights and nevertheless wished to proceed with the polygraph questioning. "The inquiry is simply whether the warnings reasonably 'convey to a suspect his rights as required by Miranda.'" Duckworth v. Eagan, 492 U.S. 195, 203 (1989) (quoting Prysock, 453 U.S. at 361) (brackets omitted); see also United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991) (relevant issue is whether Miranda warnings were "brought home to him in an intelligible fashion."). Based on the testimony at the suppression hearing, I find that the warnings given to Spoor on December 6, 2012 here were adequate to satisfy the requirements of Miranda.

B. Voluntariness: In addition to arguing that he was never properly advised of his Miranda rights, Spoor also claims that any post-waiver statements he made on December 6, 2012 were not voluntary.

"A confession is admissible under the Constitution only if it is made voluntarily." United States v. Orlandez-Gamboa, 320 F.3d

14

328, 332 (2d Cir. 2003). The prosecution bears the burden of demonstrating that a confession was voluntary. United States v. Siddiqui, 699 F.3d 690, 707 (2d Cir. 2012), cert. denied, ___ U.S. ___, 133 S. Ct. 2371 (2013). In making the voluntariness determination, the Court should consider the "totality of circumstances" surrounding the particular interrogation at issue. Arizona v. Fulminante, 499 U.S. 279, 286 (1991). "Relevant factors that should be considered include the accused's age, his lack of education or low intelligence, the failure to give Miranda warnings, the length of detention, the nature of the interrogation, and any use of physical punishment." Campaneria v. Reid, 891 F.2d 1014, 1020 (2d Cir. 1989), cert. denied, 499 U.S. 949 (1991). "The inquiry is thus intensely factual and, while prior cases may provide some guidance as to what impact various circumstances may have on voluntariness, it would be highly unlikely that any one of such cases would be so similar in all circumstances as to constitute a binding precedent." Maxwell v. Russi, No. 83-CV-713E(M), 1992 WL 106302, at *2 (W.D.N.Y. Apr. 3, 1992).

Here, Spoor's counsel argues that "Mr. Spoor's lesser intelligence along with the lengthy period of questioning and then finally, the deceit about the polygraph results was enough to overcome Mr. Spoor's free will and made his statements involuntary." See Defendant's Post-Hearing Submission (Docket # 53) at 2. Based

on the totality of the circumstances of the encounter between Spoor

and law enforcement on December 6, I find that the government has

demonstrated that the circumstances in which Spoor was questioned

were not so coercive or oppressive as to require suppression of his

confession as being involuntarily made.   First, despite Spoor's

claim to the contrary, the Court finds that Spoor's level of

intelligence does not favor a finding of involuntariness.   Spoor is

an adult who graduated from high school and has been trained as a

welder and machinist.   He was employed full-time until November 2012

when he went "out on disability."   Tr. C at 21.   While Spoor may have

had trouble with reading and writing, he is intelligent enough to

manufacture parts for airlines to "precise dimensions," and he

performed well at his job.   Tr. C at 21—22.   Having had the

opportunity to observe Spoor answer questions under both direct and

cross-examination at the suppression hearing, the Court rejects

Spoor's claim that his "lesser intelligence" rendered him

particularly vulnerable to making involuntary statements to police.

See, e.g., United States v. LeBrun, 363 F.3d 715, 726 (8th Cir. 2004),

cert. denied, 543 U.S. 1145 (2005) ("we have concluded that where

the defendant possessed at least average intelligence, then his

inculpatory statements were not compelled"); United States v. Allen,

No. 5:12-cr-115, 2013 WL 2481528, at *9 (D. Vt. June 10, 2013)

(subnormal   intelligence   does   not   automatically   invalidate

confession as involuntary).

As to the length of the encounter between Spoor and police, the Court notes that although Spoor was with members of the State Police from 4:30 p.m. until almost midnight on December 6, the actual periods of questioning were relatively brief. Indeed, much of that time period was spent sitting unrestrained in the front seat of an unmarked police car as he travelled to the Waterloo barracks and the Canandaigua barracks, seated in the public lobby of the Canandaigua state police barracks, providing biographical information to the polygraph operator, listening to an explanation of the polygraph procedure, and sitting alone in the polygraph suite. The questions posed by the polygraph operator did not begin until about 9:00 p.m. and lasted about an hour. Spoor's post-polygraph admissions were made at about 10:45 p.m., and the recorded confession was made during an interview that only lasted about twenty minutes. The hearing testimony confirmed that Spoor was not subjected to unrelenting, coercive, or overbearing interviewing techniques. Spoor was never restrained, handcuffed, or physically touched during the questioning. There were several breaks, Spoor used the restroom, he was offered food and drink, he never expressed fatigue or displayed anxiety, and he was calm and subdued throughout. It is true that Investigators Crowley and Gerbic decided to deceive Spoor and falsely told him that he "did not pass" the polygraph examination as part

17

of their interrogation strategy. Even assuming such tactics are improper, deliberately misrepresenting the results of a polygraph test does not in itself render a confession involuntary. Mastin v. Senkowski, 297 F. Supp. 2d 558, 603 (W.D.N.Y. 2003) (fact that police may have lied "about the accuracy of the polygraph and its results" does not necessarily result in an involuntary confession); see also United States v. Haswood, 350 F.3d 1024, 1029 (9th Cir. 2003) (even where officer was untruthful regarding results of polygraph test, totality of the circumstances did not show confession to be coerced); United States v. Bryant, 2015 WL 847496, No. 4:11CR00447 AGF, at *5 (E.D. Mo. Feb. 26, 2015) ("[M]isrepresentations about the existence, results, or validity of polygraph evidence, without more, are insufficient to constitute coercion."); United States v. High Horse, 2008 WL 2783197, No. CR 07-50091-RHB, at *2 (D.S.D. July 17, 2008) (officer's "statement that defendant had failed the [polygraph] test, truthful or not, is not a sufficient basis, standing alone, to satisfy the overborne-will element that is required in finding of involuntariness"); McNeal v. Rdo, 1988 WL 108440, No. 88 CIV. 3435 (MGC), at *4—5 (S.D.N.Y. Oct. 6, 1988) (police officer's lie regarding polygraph test results, "although deplorable," did not necessarily render a confession involuntary).

In sum, the facts surrounding law enforcements questioning of Spoor on December 6, 2012 did not rise to the level of a "coercive

18

and overbearing experience."  United States v. Bye, 919 F.2d 6, 10
(2d  Cir.  1990).   Accordingly,  under  the  "totality  of  the
circumstances,"  Spoor's  statements  to  law  enforcement  were
voluntary.

## II.  December 21, 2012 Statements to Homeland Security Agents

Spoor  also  contends  that  he  "was  coerced  into  making
incriminating statements to Homeland Security agents" on December
21, 2012.  See Defendant's Post-Hearing Submission (Docket # 53) at
5.  According to Spoor, although the federal agents told him that
they were there to talk about child pornography and not the pending
state molestation charges, he "did not understand the difference
between state molestation charges and Federal child pornography
charges."  Id.  Thus, Spoor argues, his "will was overcome by the
confusion created by the Homeland Security agents and therefore his
statement [to the federal agents] was not voluntary."  Id. at 5–6.[4]

Spoor's arguments are without merit.   There certainly was
nothing  coercive  or  overbearing  about  Agents  Wisniewski's,

_____

[4]  At the conclusion of the suppression hearing the government
confirmed that the only statements Spoor made on December 21, 2012
that it intends on using in its case-in-chief at Spoor's federal trial
are those statements relevant to the child pornography charges.  See
Tr. C at 26–27.  Thus, to the extent Spoor made statements to the
federal agents regarding the molestation charges for which he was
represented by assigned counsel, the government has agreed that those
are not relevant to the federal prosecution and the government will
not introduce those statements at trial.

Matthews's, and Williams's questioning of Spoor on December 21.  The
entire encounter occurred in familiar surroundings.  Spoor invited
the agents into his home and then spoke with the agents while seated
at the kitchen table in the family residence.  Spoor was never
restrained, threatened with arrest, or taken into custody.  Indeed,
Agent Wisniewski testified that she specifically told Spoor "that
he was under no obligation to speak with us" and that "if he didn't
want to speak with us, he could let us know at any time and we would
stop asking him questions."  Tr. C at 13.  The entire encounter
lasted less than an hour, and Spoor never expressed a desire to end
the questioning or sought the assistance of counsel.  Put simply,
there are no facts upon which this Court could base a finding that
Spoor's December 21 statement to federal agents was involuntary.[5]

---

[5]    In his original motion papers the defendant argued that his
December 21, 2012 statements to federal agents were obtained in
violation of his Sixth Amendment right to counsel because at the time
of the interview by federal agents he had assigned counsel on the
state charges.  See Defendant's Omnibus Motions (Docket # 18) at
8–11.  Although Spoor sought a fact finding hearing to support his
suppression argument, no testimony was adduced at the suppression
hearing to support the alleged Sixth Amendment violation.  Moreover,
Spoor does not argue any Sixth Amendment violation in his
post-hearing submission to this Court.  In any event, to the extent
the argument has not been deliberately abandoned, based on the record
before the Court, the Homeland Security agents were investigating
federal child pornography charges and not seeking to question the
defendant about the pending state charges involving child
molestation.    The Sixth Amendment right to counsel is "offense
specific."  McNeil v. Wisconsin, 501 U.S. 171, 175 (1991).  Although
Spoor's "state charges were pending at the time that he was
interrogated by the federal agents, any Sixth Amendment rights
related to the state offenses would not serve to restrict the ongoing

## Conclusion

For the foregoing reasons, it is my Report and Recommendation
that the defendant's motion (Docket # 18) to suppress the statements
he made to law enforcement on December 6, 2012 and December 21, 2012
be denied.

SO ORDERED.

_____
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:     June 17, 2015
           Rochester, New York

---

investigation into uncharged federal crimes where, as here, that
investigation is not tied to the state's conduct."  United States
v. Worjloh, 546 F.3d 104, 108 (2d Cir. 2008), cert. denied, 560 U.S.
979 (2010).  The December 21 questioning occurred with the purpose
of speaking to the defendant about charges other than those for which
he already had a lawyer.  Because it appears the December 21, 2012
interrogation "was unquestionably independent of the state arrest
and investigation," no Sixth Amendment violation occurred.  Id.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York.[6]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. See, e.g., Paterson-Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** Thomas v. Arn, 474 U.S. 140 (1985); Wesolek v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b)(2) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

SO ORDERED.

_____
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:      June 17, 2015
            Rochester, New York

---

[6]  Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation.     Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed.    United States v. Andress, 943 F.2d 622 (6th Cir. 1991), cert. denied, 502 U.S. 1103 (1992); United States v. Long, 900 F.2d 1270 (8th Cir. 1990).