1         IN THE UNITED STATES DISTRICT COURT

2      FOR THE WESTERN DISTRICT OF NEW YORK

3              ROCHESTER DIVISION

4    - - - - - - - - - - - - - - - X
     UNITED STATES OF AMERICA
5
                    DOCKET NO. 13-CR-6059 (CJS)
6      vs.
                        VOLUME V
7    RONALD T. SPOOR,

8      Defendant                      )

9    - - - - - - - - - - - - - - - - X

10

11                TRANSCRIPT OF JURY TRIAL
         BEFORE THE HONORABLE CHARLES J. SIRAGUSA
12             UNITED STATES DISTRICT JUDGE
                 MONDAY, JANUARY 11, 2016
13

14

15   APPEARANCES:

16   On Behalf of the Government:

17      CRAIG R. GESTRING, Assistant US Attorney

18      BRADLEY E. TYLER, Assistant US Attorney

19

20   On Behalf of the Defendant:

21      MARK D. FUNK, Esq.

22

23

24   Reported by:

25   John M. DiMartino, CSR, RPR

```
 1   (Jury not present.)
 2           THE COURT:  Note the presence of counsel and the
 3   defendant.
 4           I looked at the submissions.  Did you get, Mr.
 5   Funk, the new exhibit list?
 6           MR. TYLER:  I can't remember if we submitted --
 7           THE COURT:  I was told you gave me an updated one
 8   or --
 9           MR. TYLER:  Yes, Judge.
10           THE COURT:  I also added in and I will get you hard
11   copies -- Mr. Tyler sent me an e-mail saying I left out the
12   intent language.  I included that.
13           Here's the interesting thing.  Essentially, Mr.
14   Funk, what you want me to do is to conclude -- is to include
15   - I did initially - include that under one of the -- again,
16   the definition is what is sexually explicit conduct and one
17   of the things it can be is lascivious.
18           I did include that mere -- I think I put nudity in
19   and of itself is not sufficient.
20           We found this case that kind of talked about that.
21           I read your submission, Mr. Tyler.  It's a District
22   of Vermont case, 831 Fed Supp 2nd 804.
23           It says in pertinent part this:  Although the
24   defendant correctly contends that nudity alone is not
25   sexually explicit conduct, a reasonable jury could find the
```

1   visual depictions are sexually explicit conduct.

2           Now, that seems contradictory, but then you look at

3   the footnote.  We have not previously defined mere nudity,

4   although other courts have suggested examples of what would

5   constitute mere nudity.

6           For example, in United States versus Kemmerling, an

7   Eighth Circuit case - I won't give the cite - we distinguish

8   images of genitals of young males which we labeled as

9   lascivious from those that could be classified as depicting

10  mere nudity.

11          These lascivious images were not designed, for

12  instance, simply to provide a clinical view of the children's

13  anatomy that are pictured.

14          The Third Circuit in explaining the concept of mere

15  nudity stated that no one could seriously think that a Renoir

16  painting of a nude woman or an innocuous family snapshot of

17  the child in a bathtub violates the child pornography laws.

18          It goes on to say -- conclude these videos of

19  teenage minor females disrobing and weighing themselves in

20  the nude cannot compare to innocent family photos, clinical

21  depictions or works of art.

22          I think your statement of the law is correct, but

23  it needs to be put in some kind of context.

24          In other words, you're right.  I think as a

25  proposition in and of itself nudity would not constitute

1    sexually explicit conduct under the definition of lascivious,

2    but in context it could.

3          MR. TYLER:  I think that's what Judge Sessions was

4    saying in the Vermont case, Judge.

5          THE COURT:  The question is what do you want me to

6    do?

7          I would give that charge and instead of putting it

8    under lascivious I would -- the cases seem to put it under

9    sexually explicit conduct.

10          I would say that mere nudity in and of itself would

11    not be sexually explicit contact -- would not necessarily be

12    sexually explicit conduct.  You have to consider the context.

13          For example, no one could seriously think that a

14    Renoir painting of a nude woman or innocuous feeding violates

15    child pornography laws.  I think that's a fair statement of

16    the law.

17          On the other hand, the Second Circuit said -- as

18    the Third Circuit said in United States versus Knox at 32

19    Fed. 3rd 733, 750 cert. denied 513 US 1109, a reasonable jury

20    could find that these videos of teenage minor females

21    disrobing and weighing themselves in the nude cannot

22    reasonably be compared to innocent family photos, clinical

23    depictions or works of art.

24          I will think about what you want me to say.  I can

25    either say nothing or kind of give that explanation.

1          I don't assume I can go wrong by citing the Third

2    Circuit in a case that cert has been denied.  I'm trying to

3    think how I could fashion an instruction.

4          You'd have to consider the content, for example, if

5    family photos, clinical depictions or works of art would not

6    violate the child pornography laws.

7          MR. FUNK:  Judge, I think the issue I have is the

8    cases -- what that case that the Court is talking about does

9    say -- it gives those examples, but there's a whole myriad of

10   cases that have a more expansive we'll say definition of mere

11   nudity.

12         The Fifth Circuit in the Steen case where a guy was

13   accused of videotaping someone at a tanning booth - a young

14   girl tanning naked - said just the fact that she's naked

15   doesn't make it -- mere nudity is not child pornography, and

16   that doesn't qualify as a clinical depiction or a work of

17   art, and the Court still found that that was not -- that just

18   because she was nude it wasn't child pornography.

19         So I think that that case -- the Court is citing

20   it, you know, correctly, but I think that's one case that has

21   a limited view on the subject.

22         Even the Third Circuit in Doe versus Chamberlain

23   takes a more expansive view of the nudity issue where a woman

24   -- actually that was a civil case, but they were discussing

25   the definition of child pornography where a woman was taking

1   photographs of young girls that were staying at her house

2   that were friends of her family and found that mere nudity in

3   that context where they were taking showers, they were

4   playing on the beach nude, was not child pornography.

5           So I would just ask the Court to leave the nudity

6   language as we discussed, and obviously in summation I can

7   put my argument in context and the government can put their

8   argument in context.

9           The jury can take it for whatever it's worth.

10          THE COURT:  I think it would be fair if I did this,

11  if I said -- would you both agree with this:  Nudity in and

12  of itself is not necessarily sexually explicit conduct.  You

13  have to consider the context.

14          MR. FUNK:  I think the Court already does that in

15  the first part of the Court's proposed instruction.

16          Whether a picture or image of the genitals or pubic

17  area constitutes such requires a consideration of overall

18  content of the material.

19          It already is in the Court's instructions.

20          THE COURT:  Here's what I will do:  I will say -- I

21  think in the instruction it says nudity in and of itself is

22  not --

23          MR. FUNK:  Is insufficient to find an image is

24  lascivious exhibition.

25          THE COURT:  The nudity in and of itself -- that's

1    not true.  I mean, that's really not true.

2              We're both agreeing on that.

3              So you could have, for example, in this case the

4    jury could clearly find that taking a picture of your son as

5    he's peeing is lascivious.

6              I mean, it's a question of fact for the jury.

7    That's what most of these cases say.

8              How can we fashion a fair instruction?

9              If I indicate -- let me go to -- I say whether a

10   child was fully or partially clothed, however, I instruct you

11   that nudity in and of itself may not be sufficient to find an

12   image is lascivious exhibition and then let you argue, but

13   then if I'm Mr. Tyler he may say, of course, nudity -- there

14   are circumstances where nudity alone may not be a painting by

15   a master -- you know, a master piece, a clinical photo at a

16   doctor's office.

17             That's not what we have here.  He certainly can

18   argue that.

19             You can argue -- would you agree if I say -- if I

20   change it to say that I instruct you, however, that nudity in

21   and of itself may be insufficient to find that an image is a

22   lascivious exhibition?

23             What I have said --

24             MR. FUNK:  Yes, Judge.

25             THE COURT:  Is that fair?  What I said is really is

1  not true.

2          So I will add if that's what you want, Mr. Funk, I

3  instruct you that nudity in and of itself may be

4  insufficient.

5          Is that a fair statement?

6          MR. FUNK:  Yes, Judge.

7          THE COURT:  Okay.  Fair?

8          MR. TYLER:  Yes, Judge.

9          THE COURT:  All right.  Let's -- Mr. Funk, I did --

10  I will have Kelly make copies of this.

11          I did add a couple things.  First of all, I left

12  Mr. Gestring out in the original one.  We put him in.

13          When I'm defining state of mind I added

14  intentionally because under the attempt charge it uses

15  intent.

16          And then I've -- when I'm explaining the elements

17  of child -- production of child pornography I do under

18  element two say that the government is maintaining that they

19  enticed or attempted to entice, give the definition of

20  attempt, but then say -- let me find it.

21          MR. FUNK:  Judge, with regard to the attempt I

22  would just note my objection.

23          The court ordered the parties to submit proposed

24  jury instructions in advance of trial.  The government didn't

25  submit attempt language.

1          I know it's charged in the indictment as an

2     attempt, but they did not as part of their proposed jury

3     instructions include attempt language and I've been

4     proceeding under that reliance on that -- their submissions.

5          So I would object to the Court adding the attempt

6     language at this juncture.

7          THE COURT:  That application is denied.

8          Again, it was contained in the indictment.  The

9     fact that they proposed certain charges doesn't require

10    them -- in fact, the government doesn't have to -- no one

11    really has to submit anything.  It's the Court's obligation

12    to charge.

13         What I say is this:  I instruct you that as to

14    counts one and two and this requisite second element, in

15    order to find the defendant guilty you must unanimously agree

16    beyond a reasonable doubt on whether the defendant attempted

17    to commit the crime charged or actually committed the crime

18    charged.

19         They can't -- I want to avoid the situation where

20    three think it's an attempt and nine think it's a completed

21    act.

22         So I will include that language.  You can have an

23    exception to the Court's charge.

24         What do we have left for today?

25         MR. TYLER:  Judge, we have three witnesses.

1          We wanted to recall Robin Cooley very quickly
2   because going through my notes from Friday we did not have
3   her set the time frame for the bathroom video.
4          I'm just going to ask her if she can approximate
5   the time frame when those images were captured.
6          We have inspector -- a postal inspector with regard
7   to a known series of images and an FBI agent with regard to
8   known images that are the same images found on one of the
9   hard drives that Mr. Spoor had.
10          Then we have the certification business records and
11   then I think we're done.
12          THE COURT:  What is the point of having someone
13   come up and identify a known series?
14          MR. TYLER:  Because I think that the jury needs to
15   know that these are not -- that they are real children.  They
16   are not computer created.
17          THE COURT:  Because computer created would not be
18   --
19          MR. TYLER:  Would not satisfy the statute.
20          THE COURT:  What are they going to testify to?
21          MR. TYLER:  Both men -- both agents will testify
22   that at a point in time they had child exploitation
23   responsibilities.
24          They were involved in an investigation in which
25   images were seized and that they met as part of their

 1   investigation the child victims in the images that were
 2   seized in their investigation.
 3           They have reviewed the exhibit pictures in this
 4   case and they are the same images that were captured in their
 5   investigation and they're the same children and they're less
 6   than eighteen years old.
 7           THE COURT:  How do they know they're less than
 8   eighteen years old?
 9           MR. TYLER:  They met them.  They actually talked to
10   them.
11           THE COURT:  How is that not hearsay?
12           They're going to say, "I met these kids.  I met
13   these children.  They were clearly -- I estimate they were
14   like" -- what, you can estimate someone's age?
15           MR. TYLER:  I think that's what they do.
16           THE COURT:  They're not going to say this is what
17   the parents told them.
18           MR. TYLER:  No, no.
19           THE COURT:  All right.  Let's proceed.
20           MR. FUNK:  Judge, with regard to the recalling of
21   Ms. Cooley I object.
22           First my notes reflect that she was asked the
23   questions that Mr. Tyler is discussing and said that Jace
24   Spoor was at least eight is I think what she said regarding
25   that testimony.

```
 1              So calling her I think would be bolstering.
 2              MR. TYLER:  She made that reference, Judge, in
 3   regard to what I call the camper video.  She said she thought
 4   her son was eight or nine years old in that video.
 5              We're talking about the separate bathroom video in
 6   which the time frame was not set.
 7              THE COURT:  I will grant the --
 8              MR. FUNK:  Judge, my recollection is that in --
 9   with regard to one of the videos she said seven or eight and
10   in the other she said at least eight and was asked regarding
11   both is my recollection.
12              THE COURT:  I honestly don't recall.  I don't see
13   any real prejudice to allow the government to recall her.
14   That application is granted.
15              Let's bring the jury out please.
16              Mr. Funk, would you like me to have a copy of the
17   instructions with the changes printed up with the attempt
18   language included?
19              If you do I'll have Kelly --
20              MR. TYLER:  I would, Judge.
21              THE COURT:  Okay.
22              Counsel, a copy of the indictment, does it say the
23   kids' names?
24              MR. FUNK:  Yes, it does.
25              THE COURT:  I will send the indictment back to the
```

 1    jury and I just eliminate -- since they heard the names of

 2    the children I put the names in.

 3              Counsel, when we finish proof we're ready to go to

 4    closing arguments?

 5              MR. TYLER:  Yes, Judge.

 6              In that regard at the very end of mine we wanted to

 7    show portions of counts one and two video.  Mr. Gestring will

 8    do it from the table.

 9              THE COURT:  In your summations you can use anything

10    that has been received in evidence.

11    (Jury present.)

12              THE COURT:  Note the presence of counsel, the

13    defendant and the jury.

14              Folks, you can have a seat.  Good morning.  I hope

15    everybody had a great weekend.

16              We are ready to continue the case.  You will recall

17    when we broke we were still in the process of hearing the

18    government's presentation of evidence.

19              Mr. Tyler, please call your next witness.

20              MR. TYLER:  Thank you, Judge.  The United States

21    would call Robin Cooley.

22              THE COURT:  By way of explanation, this is the same

23    Robin Cooley.  The government has asked permission to recall

24    her to add some testimony.  I have granted that application.

25              Her testimony will be brief.

ROBIN COOLEY

1

2          recalled herein as a witness, having been

3       previously duly sworn, testified further as follows:

4              THE COURT:  Good morning, Ms. Cooley.  You are

5    still under oath.  Please have a seat.

6              Go ahead, Mr. Tyler.

7              MR. TYLER:  Thank you, Judge.

8    DIRECT-EXAMINATION BY MR. TYLER:

9    Q.   Good morning, Ms. Cooley.

10   A.   Hi.

11   Q.   I've asked you to come back because I want to show you

12   again two photos that are in evidence, 53 C 4 and 53 C 7.

13        First showing you the photograph 53 C 4, do you see that

14   photograph on the screen?

15   A.   Yes.

16   Q.   And do you recall seeing that photograph when you were

17   here before testifying?

18   A.   Yes.

19   Q.   And then showing you Government Exhibit 53 C 7, do you

20   see that photograph on the screen?

21   A.   Yes.

22   Q.   And do you recall being shown that photograph when you

23   testified before?

24   A.   Yes.

25   Q.   As you see the photographs now and based upon your

650

1   recollection can you set the time frame when these

2   photographs were taken?

3   A.   Around June, 2012.

4   Q.   And was there a particular occasion going on?

5   A.   I believe that's my son's birthday.

6           MR. TYLER:  I have no further questions, Judge.

7           THE COURT:  Any cross-examination, Mr. Funk?

8           MR. FUNK:  Yes, Judge.

9   CROSS-EXAMINATION BY MR. FUNK:

10  Q.   Ma'am, in June of 2012 your son would have been ten

11  years old?

12  A.   Yeah.  Just turned ten.

13  Q.   Because he was born in 2002?

14  A.   Yes.

15  Q.   You testified on Friday as well, correct?

16  A.   Yes.

17  Q.   And when you were asked that same question regarding 53

18  C 7 didn't you testify that Jace was at least eight years

19  old?

20  A.   I don't remember.

21  Q.   Jace would have been eight in 2010, correct?

22  A.   Yes.

23          MR. FUNK:  I have no more questions, Judge.  Thank

24  you.

25          THE COURT:  You can step down, Ms. Cooley.  Thank

1    you.

2              Call your next witness please.

3              MR. GESTRING:  Thank you, Judge.  The United States

4    calls Inspector Brian Bone.

5                          BRIAN BONE

6              called herein as a witness, being duly sworn,

7                      testified as follows:

8              THE COURT:  It's Special Agent?

9              THE WITNESS:  It is Postal Inspector, sir.

10             THE COURT:  Postal Inspector, excuse me.  Mr. Bone,

11   what I'm going to ask you to do is speak into the microphone.

12             Also, if you would try to speak slowly and clearly

13   because our Court Reporter Mr. DiMartino is taking down all

14   the questions and answers.

15             Finally, listen to the questions you're asked by

16   the lawyers and just answer those questions.

17             For example, if you're asked a question that calls

18   for yes or no as an answer I'd like you to try to answer yes

19   or no unless for some reason you believe in fairness you

20   can't answer it that way.

21             If that's indeed the case, tell that to the lawyer

22   who put the question to you and then I'll decide how best to

23   answer.

24             Okay?

25             THE WITNESS:  Okay, your Honor.  Thank you.

1          THE COURT:  Thank you.  Go ahead, Mr. Gestring.

2          MR. GESTRING:  Thank you.

3     DIRECT-EXAMINATION BY MR. GESTRING:

4     Q.   Good morning.

5     A.   Good morning.

6     Q.   Would you please introduce yourself to the jury?  Tell

7     us who you are and what you do.

8     A.   My name is Brian Bone.  I'm a postal inspector with the

9     United States Postal Inspection Service.

10         Currently I am the liaison officer to the Computer

11    Crimes and Intellectual Property Section of the US Department

12    of Justice out of Washington, DC.

13    Q.   Sir, how long have you been doing that?

14    A.   I've been doing that position for approximately one

15    year.

16    Q.   Prior to that, sir, how were you employed?

17    A.   I was also employed with the Inspection Service in which

18    I was assigned to the Department of Justice and Child

19    Exploitation Obscenity Section also located in Washington,

20    DC.

21         I was a program manager in charge of large scale

22    investigations for our agency for approximately four years.

23    Q.   And, Inspector Bone, just to clarify, a postal inspector

24    is a federal law enforcement officer; is that correct?

25    A.   That is correct.

1    Q.    Tell us about your training and experience as it relates

2    to child exploitation child pornography crimes, sir.

3    A.    Prior to being a postal inspector I was a sheriff's

4    deputy with the Illinois County Sheriff's Police.

5          While employed there I became a detective and I was

6    assigned to work cyber crimes along with child exploitation,

7    specifically, contact offenses involving children.

8          So I received training from the State of Illinois

9    Training Board towards that along with National Center for

10   Missing and Exploited Children.

11   Q.    I need you to slow down a little bit.

12   A.    Sorry.

13   Q.    Thank you.

14   A.    Subsequent to that I received continuing training from

15   the National Center for Missing and Exploited Children along

16   with specific forensic training from various vendors to

17   include guidance offer and access data.

18         I also have spoken and presented on matters of child

19   exploitation both to other US law enforcement and

20   internationally.

21   Q.    Inspector Bone, during your time as a law enforcement

22   officer or agent have you viewed images of child pornography?

23   A.    Yes, I have.

24   Q.    Have you yourself, sir, been involved in child

25   exploitation investigations?

1    A.    Yes, I have.

2    Q.    Approximately how many times, sir?

3    A.    I would say well over a hundred.

4              MR. GESTRING:  Approach the witness, Judge?

5              THE COURT:  Certainly.

6    BY MR. GESTRING:

7    Q.    Sir, I am showing you two photographs that are already

8    marked in evidence, 62 F 1, 62 F 2.

9          I'm going to ask you, sir, do you recognize those

10   images?

11   A.    Yes, I do.

12   Q.    What do you recognize those images to be?

13   A.    They involved an investigation of the Mikael series.

14   Q.    Were you involved in the investigation of the Mikael

15   series?

16   A.    Yes, I was.

17   Q.    In the course of that what was your role?

18   A.    I was the case agent and obtained search warrants and

19   arrest warrants for the offender.

20   Q.    In the course of your investigation of the Mikael series

21   did you have an opportunity to meet with the victim in this

22   case?

23   A.    Yes, I did.

24   Q.    Can you tell us approximately when these photographs

25   were -- when these images were made?

1            MR. FUNK:  Objection, Judge.  I think that's
2    misleading.
3            Did he meet with the alleged victims in this case
4    or in the --
5            THE COURT:  Let me explain.
6            MR. GESTRING:  I'll clarify.
7            THE COURT:  So it's clear, there's certainly no
8    allegations nor is it meant to suggest that Mr. Spoor was in
9    any way involved in creating these pictures.
10            What the agent is referring to is the person
11    totally unrelated to Mr. Spoor who was responsible for taking
12    the pictures.
13            Is that correct?
14            THE WITNESS:  That's correct, your Honor.
15            THE COURT:  Does that clarify?
16            MR. FUNK:  Yes, Judge.  Thank you.
17            MR. GESTRING:  Thank you, Judge.
18    BY MR. GESTRING:
19    Q.   Again, I think you said you were involved in the
20    execution of a search warrant; is that correct?
21    A.   That is correct.
22    Q.   When was that, sir?
23    A.   That was 2011.
24    Q.   And again referring back to Government Exhibit 62 F 1
25    and 62 F 2, are there any items in here that you yourself

1   observed or seized as part of that search warrant?

2   A.   Yes, there is.

3   Q.   Can you describe what you see there, sir?

4   A.   One aspect is the actual bedding in which these images

5   are taken on along with the head board for the bed.

6   Q.   Inspector Bone, when you met with the victim in this

7   case how old was the victim when these videos were made?

8   A.   He was approximately eleven, twelve years old.

9   Q.   And where were these videos produced?

10  A.   They were produced in a township just north of

11  Philadelphia, Pennsylvania.

12            MR. GESTRING:   Judge, if I could have one minute

13  please?

14            THE COURT:   Yes.

15            MR. GESTRING:   Judge, I have no further questions

16  for the witness and would tender him for cross-examination.

17            THE COURT:   Mr. Funk, any cross-examination?

18            MR. FUNK:   Yes, Judge.

19  CROSS-EXAMINATION BY MR. FUNK:

20  Q.   Sir, let me kind of try to get this straight.

21       With regard to the two photos you just saw, in 2011 you

22  were involved in an investigation north of Philadelphia that

23  resulted in the arrest of the person that took those photos?

24  A.   That is correct.

25  Q.   And during the course of your investigation it was

 1   determined that those photos were -- or videos that those

 2   photos came from were uploaded to the internet; is that

 3   right?

 4   A.   Well, there was more specificity to that than just the

 5   internet.

 6   Q.   Can you answer the question I asked you?

 7   A.   Well, it's initially uploaded to a secretive IRC which

 8   is internet relay chat group, and those members become part

 9   of the secret group to be able to trade with other

10   individuals within that group.

11   Q.   And these -- so these photos were disseminated from the

12   -- through the relay chat and then out on to the internet to

13   all across the country or all across the world, correct?

14   A.   Well, for specificity they were actually videos.  There

15   were no images that we knew of at the time.

16       People might have made still images from the videos, but

17   they were actually full length videos that had been traded

18   amongst the group members and then subsequently possibly

19   throughout the internet.

20   Q.   And now one of your job functions like the reason you're

21   here today is to testify to just what you testified to today

22   throughout the country; is that right?

23   A.   Well, when subpoenaed by either the government or by the

24   defense, yes.

25   Q.   And that would be -- strike that.

```
 1              MR. FUNK:  Thank you, your Honor.
 2              THE COURT:  You can step down.  Thank you very
 3    much.
 4              MR. GESTRING:  If I could, one question?
 5              THE COURT:  Yes.
 6    REDIRECT-EXAMINATION BY MR. GESTRING:
 7    Q.   Just to clarify, Inspector Bone, the video -- the still
 8    images that you saw were part of a movie file, correct?
 9    A.   That is correct.
10    Q.   And prior to testifying here today you reviewed the
11    movie file and authenticated these photographs are still
12    images that were created from that movie file, correct?
13    A.   That is correct.
14              MR. GESTRING:  Thank you.  Judge, those are my
15    questions.
16              THE COURT:  Anything else, Mr. Funk?
17              MR. FUNK:  No, Judge.
18              THE COURT:  You can step down.  Thank you.
19              MR. TYLER:  United States calls Eric Brelsford.
20                        ERIC BRELSFORD
21         called herein as a witness, being duly sworn,
22                    testified as follows:
23              THE COURT:  Is it Special Agent?
24              THE WITNESS:  That is correct.
25              THE COURT:  Special Agent, good morning.
```

 1           THE WITNESS:  Good morning, your Honor.

 2           THE COURT:  What I'm going to ask you to do is

 3   speak into the microphone so every one can hear you.

 4           Speak slowly and clearly because as I'm sure you're

 5   aware our Court Reporter is taking down everything.

 6           Please listen carefully to the questions you're

 7   asked by the lawyers and just answer those questions.

 8           For example, if one of the lawyers asks you a

 9   question that calls merely for yes or no as an answer, I'd

10   like you to try to answer it yes or no unless for some reason

11   you believe in fairness you can't answer it that way.

12           If that's indeed the case, tell that to the lawyer

13   who put the question to you and then I'll decide how it best

14   can be answered.

15           Okay?

16           THE WITNESS:  Yes, your Honor.

17           THE COURT:  Go ahead, Mr. Tyler.

18   DIRECT-EXAMINATION BY MR. TYLER:

19   Q.    Good morning.

20   A.    Good morning.

21   Q.    Can you tell the ladies and gentlemen by whom you're

22   presently employed?

23   A.    I'm employed by the Federal Bureau of Investigation.

24   Q.    And how long have you been with the bureau?

25   A.    Approximately thirteen years.

1   Q.   And have you held different positions in your career
2   with the FBI?
3   A.   Yes, I have.
4   Q.   Could you please summarize to the jury those different
5   positions?
6   A.   For the last ten years I've been assigned to the Chicago
7   field office of the FBI specifically focused on computer
8   intrusion investigations, computer hacking cases.
9        My first three years in the FBI I was assigned to the
10  Milwaukee field office of the FBI where I worked primarily
11  child exploitation matters.
12  Q.   At the time that you were working child exploitation
13  cases have you received any training in regard to those types
14  of investigations?
15  A.   Yes, I have.
16  Q.   Would you please summarize that training?
17  A.   Training pertained to the applicable criminal statutes
18  that were associated with child exploitation investigations,
19  the methodology with how to conduct such investigations and
20  to a degree the psychology of offenders involved in such
21  cases.
22  Q.   And during the time period that you were involved in
23  these types of cases, and in particular with regard to
24  investigations that concerned the production and possession
25  of child pornography images, can you tell us how many

1    investigations as they related to that topic you were

2    involved in?

3    A.   Approximately eight to ten different investigations.

4    Q.   And as part of those investigations did you have

5    occasion to view images that depicted minor children engaged

6    in sexual conduct?

7    A.   Yes, I did.

8    Q.   How many such images have you viewed in that regard?

9    A.   Thousands.

10   Q.   Let me show you in evidence Government Exhibit 62 D 1, D

11   2, D 3, D 4, D 5 and D 6.

12        As you review these images, are you familiar with them?

13   A.   Yes, I am.

14   Q.   How are you -- how and why are you familiar with these

15   images?

16   A.   When I was assigned to the Milwaukee office of the FBI,

17   conducted a child exploitation investigation where we

18   identified several known victims of child pornography images

19   and videos, and the victims that are depicted in these images

20   are those children from that investigation that I conducted.

21   Q.   You're talking about the children depicted in Government

22   Exhibit D 1 through D 6?

23   A.   That is correct.

24   Q.   And as part of your investigation were these photographs

25   described by a series name?

1    A.    Yes, they were.

2    Q.    What was that name?

3    A.    It was -- the Dalmatians series is how it's become

4    known.

5    Q.    As part of your investigation in Milwaukee did you seize

6    images that are very similar to the ones that sit before you

7    in the exhibits?

8    A.    Yes, we did.

9    Q.    And as part of your investigation did you meet the

10   children depicted in the images?

11   A.    Yes, I did.

12   Q.    And at the time that you met with the victims had the

13   images been seized in the investigation?

14   A.    Yes, they had.

15   Q.    At the time that you met with the victim children what

16   were their ages?

17   A.    At the time I met with the victim children depicted in

18   these images --

19            MR. FUNK:  Objection, Judge.

20            THE COURT:  Sustained.

21   BY MR. TYLER:

22   Q.    Did you make a determination as part of your

23   investigation as to the approximate age of the individuals

24   depicted in the images before you in the government exhibits?

25   A.    Yes.

1          MR. FUNK:  Objection.

2          THE COURT:  He can certainly estimate the age of

3  the children.  You saw them; is that correct?

4          THE WITNESS:  Yes, your Honor.

5          THE COURT:  You can ask him to estimate their age.

6  BY MR. TYLER:

7  Q.  At the time you met the children can you tell us in your

8  estimation what their age was when you first met them?

9  A.  I would estimate they would have been between

10  approximately -- the youngest would have been approximately

11  nine years old.  The oldest would have been approximately

12  thirteen.

13          MR. TYLER:  If I could have a moment, Judge?

14          THE COURT:  Certainly.

15          MR. TYLER:  I have nothing further, Judge.

16          MR. FUNK:  I have no questions, Judge.

17          THE COURT:  You may step down.

18          THE WITNESS:  Thank you, your Honor.

19          THE COURT:  Call your next witness.

20          MR. TYLER:  Judge, at this time we have no further

21  witnesses, but we have business records that we've discussed

22  with the Court before.

23          THE COURT:  Yes.  Those are the records -- Mr.

24  Funk, you're aware of those records?

25          MR. FUNK:  Yes, Judge.

1          THE COURT:  They're being offered pursuant to I

2     think it was Federal Rule 902.

3          MR. TYLER:  902, Judge.

4          THE COURT:  Based on our previous discussions then

5     -- what are the numbers?

6          MR. TYLER:  They are marked as Government Exhibit

7     61, 62 B and 63 A.

8          MR. FUNK:  Can we approach, Judge?

9          THE COURT:  Yes.

10    (At side bar:)

11         MR. FUNK:  Judge, I renew my prior objection.

12    However, I also have a specific objection to 62 B.

13         It's basically a two paragraph statement from

14    Pauline Carolyn from Western Digital.

15         The first paragraph is basically the standard

16    certification.  The second is based on the foregoing

17    information I can assert that the hard drive in question was

18    manufactured in Malaysia.  Western Digital does not

19    manufacture hard drives in the State of New York.

20         I would object to that.  I think that's testimonial

21    and it goes beyond the standard certification.

22         MR. GESTRING:  There's multiple pages in there.

23    Each exhibit has multiple pages to it.  There's the 902 cert

24    --

25         THE COURT:  What does this show?

 1              MR. GESTRING:  This is the actual manufacturing

 2    record for the hard drive which I think it's Exhibit 62.

 3    This certification is based on this data.

 4              In other words, this is the manufacturing data for

 5    that hard drive which indicates it was made in Malaysia.

 6              THE COURT:  I will overrule it.  I don't see any

 7    need -- the document if you want based on the foregoing

 8    information I can assert --

 9              MR. GESTRING:  We can take that out.

10              THE COURT:  That would not be part of her

11    certification.  This certification goes to this record.

12              With respect to any of them take that out.

13              MR. GESTRING:  With respect to SanDisk, it's three

14    pages.

15              There's a one page certification, one page related

16    to the specific item, and in this case they don't keep a list

17    of the serial numbers.

18              They included the schematic and the dates and

19    locations of manufacture.

20              THE COURT:  I will receive 62 B in redacted form.

21    Take a look at those.

22              MR. FUNK:  Judge, I guess with regard to Government

23    Exhibit 61 I would make the same objection.  It's -- there's

24    a paragraph that again I would submit is testimonial in

25    nature.

1          THE COURT:  Which one?

2          MR. FUNK:  It's the paragraph beginning -- the

3     middle of the page beginning declare.

4          THE COURT:  I will delete that as well.  That's her

5     testifying.  It's not her testifying as a foundation witness

6     for the business record.

7          I assume this indicates where it was manufactured?

8          MR. GESTRING:  It does.  It indicates in field one

9     there's only two places it could be manufactured, China or

10    Taiwan.

11         THE COURT:  I will grant your application.  So that

12    is 61.

13         MR. TYLER:  Yes.  This is 63, the Seagate.

14         MR. FUNK:  Judge, I believe this is the one we

15    discussed in Court I believe possibly during our pre-trial,

16    and the Court said it would be sufficient -- I would just

17    renew my objection at this time.

18         I don't have any specific objection.

19         THE COURT:  So we're clear with respect to the

20    foundation objection going to the authentication, the Court

21    determines 902 is complied with, and therefore, they are --

22    the documents with the appropriate certification are self

23    authenticating and will be received.

24         I am overruling the foundation objection and I will

25    receive 62 A and 61 in redacted form and 63 A as is.

1    (Open Court:)

2              THE COURT:  Thank you, counsel.

3              Based on our discussion at side bar the foundation

4    objection as to each of the exhibits previously made is

5    overruled.

6              The Court finds that the government has complied

7    with the appropriate sections of the Federal Rules, Rule 902.

8              With respect to 62 A it is received in redacted

9    form.

10             THE COURTROOM DEPUTY:  63 A.

11             THE COURT:  What are the exhibit numbers?  I

12   thought it was 62 A, 63 A and 61.

13             MR. GESTRING:  Correct.

14             THE COURT:  So 62 A is received in redacted form.

15   63 A is received in redacted form.

16             Is that correct.

17             And 61 is received.

18             MR. GESTRING:  Judge, there's going to be

19   redactions to 61 as well.

20             THE COURT:  Then 63 A was received, is that number

21   correct?

22             MR. GESTRING:  63 A in its entirety and 62 B is the

23   Western Digital which will be received with redactions.

24             THE COURT:  Yes.  Does the government rest?

25             MR. GESTRING:  Yes, Judge.

1        We've given Ms. Allen our exhibits in evidence list

2   and we rest.

3        THE COURT:  What I am going to do is ask you to

4   step into the jury for a moment.  There's issues of law we

5   need to address and we will get back to you as soon as we

6   can.

7        Thank you for your cooperation.

8   (Jury not present.)

9        THE COURT:  Mr. Funk, do you have any applications?

10       MR. FUNK:  Yes, Judge.

11       With regard to the charges in the indictment I'll

12  start with -- I would move pursuant to Rule 29 for dismissal.

13       I would submit that the government has not

14  established a prima facie case with regards to the two

15  production counts and we somewhat touched on this argument

16  earlier.

17       I would cite to the Court the Fifth Circuit case of

18  Steen that I cited earlier today, US versus Steen, 634 F 3rd

19  282, Fifth Circuit, 2011.

20       I think somewhat similar to the allegations here,

21  clandestine videos being made by the defendant, the Court

22  said quote surreptitiously film, standard for producing child

23  pornography.

24       I would submit particularly with regard to the

25  bathroom video that's all we have here is a clandestine video

1    as shown in Steen and which was determined not to be child

2    pornography.

3              I'd also cite the Third Circuit case Doe versus

4    Chamberlain, 299 F. 3rd 192, Third Circuit 2002 case.

5              Again, those were clandestine photos of some young

6    girls showering that the Court determined was not child

7    pornography.

8              Also US versus Hodge, 805 F. 3rd 675, Sixth Circuit

9    2015 case where a defendant made voyeuristic videos of his

10   step daughter nude exiting the shower, getting dressed and

11   undressed in her bedroom, and in Hodge, Judge - because I'm

12   sure the government will make this argument - the Court found

13   that those items - her stepping in and out of the shower, her

14   getting dressed and undressed, being naked - was not child

15   pornography.

16             As we already discussed this morning, there is an

17   attempt charged here in the indictment and Hodge found that

18   there could be sufficient evidence for an attempt.  However,

19   I would really submit that the rationale of that is somewhat

20   suspect.

21             If the finding of the Court which it was was that

22   the videos of the girl stepping into and out of the shower,

23   getting dressed and undressed was not child pornography and

24   the defendant in that matter was attempting to get nude

25   photos of her - and again, the mere nudity issue I would

1    submit that an attempt has not been made out and I would

2    submit the rationale here is the same, Judge, that what we

3    have here is just surreptitious filming in the camper, in the

4    bathroom that the children are shown nude.

5          However, there's nothing -- again, getting to the

6    issues of sexually explicit, there's nothing that takes this

7    to that threshold of just more than nudity to sexually

8    explicit conduct and lascivious exhibition.

9          So I would submit the government has not

10   established a prima facie case with regard to the production,

11   that the videos in question do not contain child pornography.

12         I think it's exclusively two of the possession

13   counts that deal exclusively with the camper video, and I

14   would kind of incorporate my arguments just made, that the

15   camper video is not child pornography.

16         So the two possession counts based exclusively on

17   that would not -- also would not be possession of child

18   pornography.

19         One of the devices - Government Exhibit 64 - it's

20   alleged contained the camping video as well as twenty-four

21   videos that were recovered from unallocated space according

22   to the testimony of Agent Gillett, I'd submit, Judge, with

23   regard to the twenty-four videos the government has not

24   established a prima facie case regarding -- I would submit

25   there's been no testimony regarding the content of those

1    videos whatsoever.

2           I believe that they never had Agent Gillett

3    summarize what was viewed in those videos.

4           They did more than once attempt to say that the

5    videos match the descriptions on their -- another exhibit of

6    the names of the videos which was not entered into evidence,

7    and I don't believe there was any description of what the

8    twenty-four videos contained other than Agent Gillett

9    believed they were of evidentiary value.

10          So I would submit that they have not established

11   and the twenty-four videos should not go to the jury.

12          Lastly, Judge, with regard to all the possession

13   counts including the Western Digital hard drive that

14   contained allegedly about one hundred twenty images and

15   approximately two hundred forty videos, I would submit that

16   the government has failed to establish knowing possession.

17          Agent Gillett testified that during his forensic

18   examination he did not test and did not determine when these

19   were downloaded from the internet, who downloaded them, and

20   so I would submit that based on that evidence or lack of

21   evidence the government has not established knowing

22   possession by Mr. Spoor.

23          There was testimony from Steve Cooley that others

24   including him and Robin Cooley had access to these computers

25   and devices.

 1              So I would submit they have not established a prima

 2    facie case regarding any of the six counts.

 3              THE COURT:  Thank you.  Let's go through the

 4    possession counts second.

 5              Possession three pertains to the Western Digital

 6    hard drive and your argument there is that you're entitled to

 7    judgment of acquittal on that count because the government

 8    hasn't established the knowing requirement?

 9              MR. FUNK:  Correct.

10              THE COURT:  With respect to four - count four - the

11    Seagate Momentous hard drive, your argument there as well, is

12    there any additional argument on that count?

13              I understand your argument as to each of the

14    possession counts three, four, five and six is the government

15    has failed as a matter of law to establish knowing, and for

16    that reason the case -- those counts should be taken from the

17    jury, but any additional arguments on four?

18              I want to make sure I'm following each argument.

19              MR. FUNK:  Judge, I believe that four - the

20    Seagate - is Government Exhibit 63 only contains the camping

21    video, and so my argument is that the camping video is not

22    child pornography.

23              THE COURT:  Okay.  How about five, the generic one

24    hundred gigabyte hard drive, again, your arguments are

25    knowing and any other?

1             MR. FUNK:  Yes.

2             Again, that's the camping video.  The camping video

3    does not contain child pornography, and that is the item that

4    contains the twenty-four videos that I would submit there was

5    no testimony describing the contents of those videos.

6             THE COURT:  And item six, the custom built tower,

7    again that's the knowing?

8             MR. FUNK:  Knowing.

9             That's also -- I believe the camping video is

10   contained on that device, and again, the camping video is not

11   child pornography.

12            THE COURT:  Thank you, Mr. Funk.

13            Mr. Tyler, let's go with the production counts.

14            Essentially Mr. Funk is arguing that all the

15   production counts one and two do is display nudity and that's

16   insufficient as a matter of law to allow those counts to go

17   to the jury.

18            MR. TYLER:  Yes, Judge.

19            My position as to counts one and two is that they

20   are certainly - although there's not sexual contact - they

21   are sexually explicit and the lascivious exhibition of the

22   genitalia of the boys in both videos, given the setting, the

23   framing, the focal point and the lascivious exhibition.

24            THE COURT:  With respect to the possession counts

25   address his argument about the twenty-four videos.

1            MR. TYLER:  Yes.  That would be count five, the

2    generic one hundred gigabyte drive.

3            Judge, it does have the camping video on it, but it

4    also has the other videos.

5            I think that Special Agent Gillett is the only

6    person who spoke about those videos, and he was permitted

7    only to indicate that they had evidentiary value.

8            I don't recall that he gave a specific explanation

9    of the images.

10           THE COURT:  But the hundred gigabyte -- what number

11   is the generic hard drive, what exhibit?

12           MR. GESTRING:  64, Judge.

13           THE COURT:  Is that in evidence?

14           MR. TYLER:  Yes.

15           THE COURT:  Are the other twenty-four videos on

16   that?

17           MR. TYLER:  Yes.

18           THE COURT:  So, Mr. Funk, since it's in evidence,

19   if the jury asks to see it, could they?

20           MR. TYLER:  Yes, they could.

21           THE COURT:  In other words, the fact that -- the

22   only -- I mean, anything that is in evidence the jury can

23   see.

24           With respect to some of the -- there were two CDs I

25   think that we said were not necessarily going back to the

1    jury.  There were just pictures displayed.

2            However, if the jury wanted to see them they could.

3    They're in evidence.

4            With respect to the -- to the extent you're going

5    to make the argument that the twenty-four videos are not

6    child pornography and the jury wants to see them, since

7    they're in evidence, could they not see them then?

8            I'm trying to anticipate.

9            MR. FUNK:  I understand.

10           THE COURT:  Your argument, you're going to say,

11   "This camper video is not child pornography," and if the jury

12   came back and said, "Okay.  We agree with you, Mr. Funk, but

13   we want to see -- what about the other twenty-four videos,

14   Judge, can we see them?"

15           Obviously since they're in evidence they have to

16   view them, would be allowed to view them, correct?

17           MR. FUNK:  Yes, Judge.

18           THE COURT:  Okay.  Understood.  The Court is

19   prepared to rule.

20           On a Rule 29 motion for judgment of acquittal as a

21   matter of law, the standard the Court must apply is clear.

22           The Court must view the evidence in the light most

23   favorable to the government who is the non-moving party and

24   accord the government all reasonable inferences to be drawn

25   from the evidence.

1           In making that determination it is not up to the

2     Court to resolve credibility issues.  That would be for the

3     jury.

4           The Court can grant the application only if it

5     determines as a matter of law as to the count under

6     consideration --

7           MR. FUNK:  Judge, I apologize.  I do have another

8     argument regarding dismissal.

9           THE COURT:  Okay.  Go ahead.

10          MR. FUNK:  It gets back to part of the testimony

11    regarding Robin Spoor today.

12          I think there's a substantial difference in the

13    indictment, her testimony as well as the testimony of Sandy

14    Daeffler as to when these videos were created.

15          The indictment does allege June of 2012 or so I

16    believe.  That's for the bathroom video.

17          THE COURT:  Right.

18          MR. FUNK:  Again, I'd submit my recollection is

19    that Robin Spoor testified on Friday that Jace was eight

20    years old at the time that this video was created which would

21    make it 2010 - substantially different time period.

22          I think that's also consistent with the testimony

23    of the other mother in this situation that testified that -

24    Tonya Borthwick - with regard to the camper video as well,

25    Judge, the allegations is that it was created in April of

1    2012.

2            Ms. Spoor's testimony on Friday was that Jace Spoor

3    was eight or nine years old at the time that video was

4    created.

5            That would make it in the 2009, 2010 time frame,

6    and Sandy Daeffler's testimony was that her son was just shy

7    of fourteen.

8            His birthday next week would make him fourteen

9    years old; that he was eight or nine at the time that that

10   video was created which would get us to 2010.

11           So I think there's a substantial difference between

12   the allegations in the indictment and the testimony of the

13   mothers as to when these videos were created based on their

14   estimates of the children's time frame.

15           THE COURT:  What is your argument on count two?

16           Again, count two says in or about July of 2012.

17           Are you saying based on the testimony of

18   Ms. Borthwick and Ms. Cooley that that puts that at 2010?

19           MR. FUNK:  Correct.

20           THE COURT:  Well, let me talk to the government.

21           What is your recollection?  The requirement, of

22   course, is substantial similarity.

23           The question becomes, number one, is Mr. Funk

24   correct, did the mothers in this case - Ms. Daeffler,

25   Ms. Cooley and Ms. Borthwick - put the events based on their

 1   viewing them in the 2009, 2010 range?

 2            MR. TYLER:  With regard to the camper video, Robin

 3   Cooley and Sandy Daeffler looked at those images and

 4   estimated their sons' ages to be eight or nine years old at

 5   the time which would at the earliest be 2010, at the latest

 6   2011.

 7            Count one charges -- I think charges April, 2012.

 8            With regard to count two --

 9            THE COURT:  But the question is -- we're going to

10   have to get their testimony.

11            MR. FUNK:  My recollection is with regard to

12   Ms. Spoor the testimony was seven or eight years old.

13            With regard to Ms. Daeffler it was eight or nine

14   which again would get us about 2010 and I -- looking at my

15   notes, Ms. Borthwick only testified I believe that her child

16   is currently eight years old.

17            I don't think she estimated the child's age -

18   according to my notes - estimated the child's age in the

19   photos.

20            THE COURT:  They testified on Friday, correct?

21            MR. FUNK:  Yes, Judge.

22            THE COURT:  Counsel, we will discuss this in a

23   moment.

24            Counsel, I want to make sure any notes I took were

25   accurate.

1          Here's what I have:  Starting backwards, Ian
2  Borthwick's mother Tonya testified that he was born on April
3  4th, 2007 and she was shown Exhibits 53 C 14 and 53 C 15
4  which were the bathroom pictures.
5          MR. TYLER:  Yes.
6          THE COURT:  And she said -- her testimony was that
7  he was eight years now.
8          MR. FUNK:  Correct.
9          THE COURT:  So now is 2016.  I don't think she was
10  asked -- I didn't see it in the testimony.  Was she asked to
11  estimate how old he was in the picture?
12          MR. FUNK:  That's correct, Judge.  That's my
13  recollection.
14          THE COURT:  She was not.
15          MR. FUNK:  She was not.
16          THE COURT:  All right.  So as to Mr. Borthwick then
17  all she said was he's eight now.
18          MR. FUNK:  Correct.
19          THE COURT:  So how does that help you with your
20  argument?
21          MR. FUNK:  That doesn't, Judge.  I just point out
22  that --
23          THE COURT:  I'm trying to do it one at a time.
24          There's no real compelling argument with respect to
25  Borthwick that the time alleged in the indictment was not

1   substantially similar to the occurrence of the event.

2            Let's go to Daeffler who is on count one.  She was

3   shown 52 F - Ms. Daeffler - which is the camper -- from the

4   camper.

5            MR. TYLER:  Yes.

6            THE COURT:  She said he was approximately eight or

7   nine.

8            Okay?  Approximately eight or nine.

9            He was born -- Justin Daeffler was born on January

10  18th, 2009 -- 2002.

11           So if he was approximately eight or nine puts us to

12  2011 not 2012.

13           That's the point you're trying to make?

14           MR. FUNK:  2010 or 2011.

15           THE COURT:  Well, I have to view the evidence in

16  the light most favorable to the government.

17           So that puts us to 2011 and not 2012.

18           MR. TYLER:  Yes, Judge.

19           THE COURT:  With respect to -- the initial

20  testimony from Robin Spoor, she views 53 C 7 which 53 -- the

21  53 C series is the bathroom, correct?

22           MR. FUNK:  Correct.

23           MR. TYLER:  Yes.

24           THE COURT:  She says upon viewing it he was at

25  least eight.

```
 1              MR. FUNK:  Correct.

 2              THE COURT:  So that doesn't help you.  At least

 3    eight doesn't help.

 4              At least eight could be nine, ten, eleven, and then

 5    today she says --

 6              MR. FUNK:  Well, Judge, I mean, just taking that

 7    eight would get us to 2010.

 8              THE COURT:  But she doesn't say --

 9              MR. FUNK:  But then today she testified it was

10    definitely he was ten years old and it was June of 2012.

11              THE COURT:  That goes -- that goes to the

12    credibility issue to me.

13              I mean, that's an argument that can be made on

14    credibility, that how can you believe her when she says --

15    she testified on the first time that he was at least eight

16    and now she's saying the picture that she was shown was taken

17    in 2012 I think she said.

18              Isn't that what she testified to today?

19              MR. TYLER:  Yes.  At the time of his birthday in

20    June.

21              THE COURT:  Now, what was her testimony about the

22    camper?

23              Was she shown -- what exhibit was she shown with

24    respect to the camper?

25              MR. FUNK:  Judge, it was 52 F 5 and my notes
```

1    indicate that she testified that in that photograph she

2    estimated Jace's age to be seven or eight.

3             He's currently thirteen.

4             THE COURT:  Let me take a look at that.

5             All right.  Here was the actual testimony:  She was

6    shown Exhibit 527 which is the camper.  She was asked:

7    Do you recognize the human being to the right.

8    Answer: Yes.

9    Question:  Who is that?

10   Answer: That's my son Jace.

11   Question:  And based on what you see in the photograph

12   are you able to approximate your son's age as depicted in this

13   photograph?

14       Answer:  He's seven or eight.

15             So eight puts us into 2010.

16             A couple issues that we need to address.  First of

17   all, here's what I instruct at the outset:  Let me explain

18   that the offense was committed on or about a certain day.  It

19   is only necessary for the government to prove beyond a

20   reasonable doubt that the offense was committed on or about

21   reasonably near the date alleged.

22             It is not necessary for the government to prove the

23   offense was committed precisely on the date charged which is

24   a statement of law.

25             Mr. Tyler, what Mr. Funk is maintaining is that --

1   I think certainly there's no issue as to count two production

2   because the only testimony with respect to count two was

3   Borthwick was eight years now.

4           I don't see how that testimony dovetails to your

5   argument.

6           The testimony was that with respect to Jace he was

7   at least eight.  So at least eight could be nine, ten,

8   eleven.

9           I think that clearly goes to the jury and any

10  argument you make concerning substantial similarity goes to

11  the weight and not a determination of the Court as a matter

12  of law that the count should be dismissed.

13          I guess I'm more bothered by count one.  We're left

14  with testimony at count one that Daeffler was approximately

15  eight or nine from his mother which puts the offense in 2011

16  and that Jace Spoor was seven or eight which puts it in 2010.

17          So to clarify that argument, Mr. Tyler, Mr. Funk is

18  moving as a matter of law to dismiss count one as to both

19  victims because he's maintaining that based on the evidence

20  presented no reasonable jury could find beyond a reasonable

21  doubt that the offense occurred on a date reasonably near the

22  date alleged in the indictment.

23          This issue -- I've been here for a lot of years and

24  this issue hasn't come up.

25          Does anybody have any law on it?  Mr. Funk, do you

1    have any law on that argument since you're making it now?

2              MR. FUNK:  I would note they only testified on

3    Friday so I haven't had extensive time to look at this issue.

4              THE COURT:  First let me rule as to the other

5    counts.

6              With respect to count two -- and let me just state

7    the test I must apply because I started to.

8              On a motion for judgment of acquittal as a matter

9    of law pursuant to Federal Rule of Criminal Procedure 29 the

10   test the Court is obligated to apply is clear.

11             The Court must view the evidence in the light most

12   favorable to the government according the government all

13   reasonable inferences to be drawn from the evidence and can

14   grant the application only if it determines as a matter of

15   law that no reasonable jury could find as to the count under

16   consideration the government has proven the count the

17   requisite elements of the charge beyond a reasonable doubt.

18             Applying that test to count two, the production

19   charge, the Court finds that the application must necessarily

20   be denied.

21             In that regard, of course, it's well settled in

22   ruling on a Rule 29 application the Court does not make

23   determinations of credibility.  That's for the jury.

24             The Court finds that a reasonable jury could find

25   that based on the testimony of Ms. Cooley and Ms. Borthwick

1    that the crime did occur on or about the time alleged in the
2    indictment; that is, in or about July, 2012, and could find
3    that the video at issue which we have referred to as the
4    bathroom video does amount to sexually explicit conduct and
5    could be viewed as child pornography.

6          In that regard, the Court finds instructive the
7    case of United States versus Goodall at 831 Fed Supp 2nd, a
8    2011 District Court of Vermont case.

9          In that regard, the Court -- the case in pertinent
10   point says the law is well settled that whether a depiction
11   is lascivious is a question of fact for the jury.

12         United States versus Fabrizzio, 455 Fed. 3rd at 80,
13   a First Circuit case also looking at United States versus
14   Rivera, 546 Fed. 3rd 245 at 253, a 2008 Second Circuit case.

15         The Court agrees whether or not the images qualify
16   as child pornography; specifically, whether or not what is
17   depicted amounts to a lascivious exhibition as the government
18   maintains is a question of fact for the jury.

19         So that application as to count two for judgment of
20   acquittal is denied.  You can have an exception to the
21   Court's ruling.

22         With respect to counts three, four, five and six,
23   the Court finds that whether the possession was knowing is
24   likewise an issue of fact for the jury, but there is
25   sufficient evidence in this case from which a reasonable jury

1    could find beyond a reasonable doubt that the defendant

2    knowingly possessed child pornography as it relates to counts

3    three, four, five and six, and the Court finds beyond a

4    reasonable -- the Court finds that a reasonable jury could

5    find beyond a reasonable doubt that the items referenced in

6    each count three, four, five and six were, in fact, child

7    pornography within the applicable definitions of law.

8           Therefore, the application -- again, considering

9    each count individually - two, three, four, five and six

10   individually - as to each count the Court finds that a

11   reasonable jury could find the government has proven the

12   defendant's guilt as to the count under consideration beyond

13   a reasonable doubt.

14          Therefore, the application for judgment of

15   acquittal pursuant to Rule 29 as to those counts is denied.

16          We come back, however, to count one, and again,

17   Ms. Daeffler's testimony was approximately eight or nine.  It

18   was approximately eight or nine -- eight, nine or ten,

19   eleven.

20          Ms. Cooley says seven or eight.  Do you have any

21   law, Mr. Tyler?

22          MR. TYLER:  Judge, we were looking at the Federal

23   Criminal Practice Second Circuit Handbook.

24          THE COURT:  Which I have.  Could you give me the

25   page?

1          MR. TYLER:  Yes.  At the bottom of 461 over to the

2    next page.

3          THE COURT:  Okay.

4          MR. TYLER:  At the very bottom it starts to talk

5    about dates.

6          THE COURT:  Okay.  Let me read the paragraph.  In

7    analyzing specificity each count in the indictment must be

8    judged on its own apart from any other count.

9          An exception to this rule is that a count may

10   incorporate by reference an allegation made in another count.

11         All right.  The time and place of an alleged --

12   reading the last sentence, crime should be set out in the

13   indictment, but the dates generally need not be exact -

14   citing United States versus Nersesian, approving language of

15   on or about a date an indictment may survive the admission of

16   the year in which the crime allegedly took place.

17         I don't know -- Mr. Tyler, let's look at that case,

18   47 Fed. 3rd -- Kathy, would you tell the jury we have issues

19   of law that have come up?

20         THE COURTROOM DEPUTY:  Yes, Judge.

21         THE COURT:  I don't know if this is helpful, Mr.

22   Tyler.  Sufficiency of the indictment -- should Nersesian's

23   contention that count five of the indictment is fatally -- in

24   failing to include the year of the commission of the offense

25   is without merit.

1          A defendant has a constitutional right to be

2     informed of the nature and cause of the accusation.

3          Moreover, the Sixth Amendment requires that the

4     indictment state the elements of the offense and be

5     sufficiently detailed to avoid double jeopardy.

6          The failure to include the year in count four of

7     the indictment is not fatally defective as to the exact time

8     when the defendants committed the crime in this case is

9     immaterial.

10         To double jeopardy, the Court may refer to the

11    entire record of the prior proceeding and will not be bound

12    by the indictment alone.

13         I don't know what that means.

14         I guess --

15         MR. TYLER:  Notice, notice.  He's been noticed and

16    there is no double jeopardy concern because we all know what

17    we're talking about.

18         We're talking about a camper video with two little

19    boys and the defendant in it.

20         THE COURT:  So what do I do when the jury comes

21    back and says this - I'm giving the charge that we all agree

22    is appropriate - "Judge, you indicated that the requirement

23    is that the government prove a substantial" -- what's the

24    language we use?

25         MR. FUNK:  Reasonably near the date alleged.

1              THE COURT:  On or about -- it is only necessary for

2     the government to prove beyond a reasonable doubt that the

3     offense was committed on a date reasonably near the date

4     alleged, and they come back and ask me, "Well, Judge, we've

5     done the math.  The indictment says 2012, but the moms put

6     this at 2011."

7              Is that reasonably near -- I mean, I guess what

8     does it mean when I'm -- again, this is the government's

9     instruction in sum and substance.

10             Is it necessary for the government to prove beyond

11    a reasonable doubt that the offense was committed on a date

12    reasonably near the date alleged?  What is that requirement?

13             If we -- if I read this Second Circuit handbook as

14    you suggest, the date doesn't matter at all and why do I

15    include this language?

16             MR. TYLER:  Then we don't.

17             The Second Circuit told you don't because, again,

18    it's notice and there's been no motion pre-trial to dismiss

19    this count.

20             THE COURT:  Right, but now we're at the trial

21    stage.

22             I'm including this language -- the government I

23    think in your submission gave me essentially the same

24    language to include.

25             MR. TYLER:  Yes.

1            THE COURT:  So --

2            MR. TYLER:  Now we've learned that the Second

3   Circuit has indicated even without the year in the indictment

4   that does not matter.

5            THE COURT:  There's got to be some reason, Mr.

6   Tyler, that I've included this in every case and your office

7   has included it in every case.

8            All I'm saying is we need to do some research.

9   There's two issues here on this count now.

10            I mean, the mom -- I'm less bothered by Daeffler

11  who says approximately eight or nine because approximately

12  eight or nine -- I mean, is eleven approximately eight or

13  nine?

14            If he's eleven -- if he's ten we're okay.  It's

15  2012.  So Daeffler doesn't bother me.

16            MR. TYLER:  Right.

17            THE COURT:  But what about the testimony of -- does

18  that become a question of fact for the jury, Mr. Funk?

19            So Daeffler I think is in the ballpark.  She says

20  approximately eight or nine.  Well, ten could be

21  approximately eight or nine.

22            That puts us in 2012 because he was born in 2002.

23            On the other hand, Ms. Cooley puts it at 2000 --

24  she says -- can we check her?

25            Does she say seven or eight or does she say

1    approximately seven or eight?

2          Mr. Funk gets up there -- what if he says this:

3    "Listen to the Judge's charge.  You know, you can't just go

4    back in there and say we've heard enough.  This guy -- these

5    are terrible charges.  Convict him, because you all promised

6    the Judge in voir dire and you promised us that you apply the

7    law whether you like it or not.

8          "You don't have to like my client, but you've got

9    to follow the law.  So listen to the Judge's charge.

10          "He's going to tell you that in order to convict my

11   client the government has to prove beyond a reasonable doubt

12   that the crimes occurred on or about the dates alleged.

13          "Now, you heard the testimony of Ms. Spoor with

14   respect to count one.  She should know the age of her kid.

15   Any parent would.

16          "You could look at a picture of your kids -- I'm

17   sure somebody shows you - especially the moms - and say,

18   'Yup, I can tell he was ten.'  She says her son with respect

19   to count one was seven or eight.  Mrs. Daeffler says

20   approximately eight or nine.

21          "Either way that doesn't put this crime in 2012,

22   and that I submit is a fatal flaw in the government's case as

23   to count one and you swore that you would do your job."

24          I mean, that's an argument.  So now the jury comes

25   back to me and says, "Judge, you know, we're -- we think the

1    crime occurred in 2011 or 2010."

2              I mean, what do we do at that point?  Is that --

3    that's why I'm suggesting that maybe -- unfortunately, we

4    need to do some further research on this point because I'm

5    anticipating if Mr. Funk makes that argument that that's what

6    they may do if we include this language in I don't want to be

7    in a position if they come back with that question not to

8    have the right answer.

9              Is it for them to decide whether something is

10   reasonably -- what is the language?

11             MR. FUNK:  Reasonably near.

12             THE COURT:  -- reasonably near the date alleged or

13   is there a point where -- I mean -- or is there a point where

14   as a matter of law it's not reasonably near the date alleged?

15             Why don't we do this:  Maybe we can try to resolve

16   this and at least get summations in today.  I don't know that

17   we'll be able to get the charge in today.

18             Let me take a look at this.  Counsel, you can try

19   to take a look at this.

20             Kathy, tell the jury a legal issue has come up and

21   we're sorry for the delay.

22             THE COURTROOM DEPUTY:  I just told them.

23             THE COURT:  Let's take about a twenty minute recess

24   and come back and see if -- you may have -- this issue may

25   have come up somewhere in the US Attorney's Office.

1            Mr. Funk, you can call maybe some other colleagues.

2       Maybe this has come up before, although I have to tell you

3       it's never come up in -- I think I've been here eighteen

4       years now.  It's never come up.

5            MR. TYLER:  Thank you, Judge.

6            MR. FUNK:  Thank you, your Honor.

7       (Recess taken.)

8            THE COURT:  Not the presence of counsel, the

9       defendant and the jury.  The Court is prepared to make its

10      ruling.

11           In doing the math which I think --

12           MR. FUNK:  I think you said the jury was present.

13      They're not present.

14           THE COURT:  The jury is not present.  Thank you.

15      The jury is not here.

16           The Court is ruling on the outstanding motion for

17      judgment of acquittal as to count one.

18           I think it's important at the outset to do the

19      math.

20           With respect to Justin Daeffler, his date of birth

21      was January 18, 2002.  Count one of the indictment reads in

22      on or about April of 2012.

23           So in April of 2012 if my math is correct Justin

24      Daeffler was ten years and approximately three months.  In

25      December of 2011 he would have been about nine years eleven

1  months.

2         Why is that significant?  Because his mother's

3  testimony - Ms. Daeffler's testimony - was that he was

4  approximately eight or nine.

5         So nine years eleven months at the end of 2011 to

6  ten years two months is in the Court's mind within the

7  ballpark of her testimony of approximately eight or nine.

8         With respect to Ms. Cooley, Robin Cooley, her

9  testimony was that with respect to count one that her son

10  Jace Spoor was seven or eight.

11         Well, in April of 2012 since his birthday is June

12  4th of 2012 he would have been nine years ten months.

13         The Court on a motion for judgment of acquittal is

14  obligated to view the evidence in the light most favorable to

15  the government and not resolve issues of credibility.

16         It's obvious from the video that the incident

17  involving Justin Daeffler and Jace Spoor alleged in count one

18  happened at the same time.

19         So the Court finds the jury could accept the

20  testimony of Tanya Daeffler - excuse me - of Mrs. Daeffler

21  that her son was approximately eight or nine.

22         The Court finds that ten years three months is

23  approximately eight or nine and finds that the incident did

24  occur reasonably close to the point alleged in the

25  indictment.

1           Moreover, in its charge, the Court says -- explains
2      with respect to the production counts that the jury has to
3      unanimously agree beyond a reasonable doubt with respect to
4      the image or images of child pornography you determine were
5      produced by the defendant for each count.
6           That being the case, on further reflection -
7      especially in light of the exact ages of the children in 2000
8      -- in April of 2012 - the government's application for a
9      judgment - excuse me - the defense application for judgment
10     of acquittal on count one is denied.
11          That is, the Court finds that depending on the
12     resolution of issues of credibility a jury could find beyond
13     a reasonable doubt that the government has proven the
14     requisite elements of the crime of production of child
15     pornography as alleged with each of the victims and the Court
16     is satisfied that a reasonable jury could find beyond a
17     reasonable doubt that the offense was committed reasonably
18     near the date alleged in the indictment.
19          Mr. Funk, you can have an exception to the Court's
20     ruling.
21          MR. FUNK:  Thank you, your Honor.
22          THE COURT:  Now, I went back on this issue of
23     nudity.  I looked at the District of Vermont case that I
24     cited and the exact language is, although the defendant
25     correctly contends that nudity alone is not sexually explicit

1    conduct.

2          So I think rather than placing the language under

3    lascivious it should be -- I can't go wrong in referring and

4    saying that -- give this instruction:  Nudity is not

5    necessarily sexually explicit conduct -- or nudity in and of

6    itself is not necessarily sexually explicit conduct.  That

7    would allow both sides to make whatever legitimate arguments

8    they want.

9          So that's where I will give the instruction because

10   I think that's more correct and then argument can be made

11   under this case depending what the definition of lascivious -

12   focusing on the genitals, watching someone urinate - this is

13   a lascivious exhibition.  This does fit the definition of

14   sexually explicit conduct.

15         So that's where I will give that.

16         Counsel, let me give you -- I don't know if I gave

17   you a copy of the charge.  That's an additional change I will

18   make.  I will give a copy.

19         Let's bring the jury out and see where we go with

20   -- when exactly we finish with summations.

21         Let me -- before we do that - I almost forgot - now

22   that the government has rested their case, Mr. Funk, do you

23   wish to put on any evidence?

24         MR. FUNK:  No, your Honor.

25         THE COURT:  Could you stand up, Mr. Spoor.  I know

1    you discussed this with Mr. Funk, but I want to go over it

2    with you.

3            If you have any questions just ask me.

4            In a criminal case there's certain decisions that

5    are left to the attorney.  For example, when picking a jury

6    it's up to the lawyer to decide who he wants on the jury or

7    not.

8            He obviously discusses it with the client, but

9    ultimately it's up to the lawyer to decide who is best to

10   pick for the jury.

11           Likewise, in questioning a witness, it's the

12   lawyer's ultimate decision on how to question the witness,

13   but there are some decisions which are left strictly up to an

14   accused.

15           One of those decisions is whether to testify or

16   not.

17           Now, obviously you've discussed this with Mr. Funk,

18   but even if he says, "I don't think you should testify,

19   Mr. Spoor.  I would recommend against it," ultimately that

20   decision is yours.

21           Do you understand that?

22           THE DEFENDANT:  Yup.

23           THE COURT:  Have you chosen in consultation with

24   Mr. Funk that it would not be in your best interest to

25   testify?

1          THE DEFENDANT:  Yes.

2          THE COURT:  Do you wish to exercise your

3    constitutional right not to testify in that regard?

4          THE DEFENDANT:  I do.

5          THE COURT:  Thank you very much.

6          MR. FUNK:  Thank you, your Honor.

7          THE COURT:  Let's bring the jury back.

8    (Jury present.)

9          THE COURT:  Note the presence of counsel, the

10   defendant and the jury.

11         Thank you for your patience.  Let me explain a

12   little bit about what goes on.

13         You heard the government rested their case.  When

14   that happens there's typically a number of legal issues that

15   we have to resolve that do take some time.  That's what we

16   were trying to resolve.

17         We have now resolved those and we have determined

18   now that proofs are closed.  You have now heard all the

19   evidence in this case that you're going to hear.

20         Our next order of business would be to hear the

21   closing arguments from the lawyers.

22         Again, just to always remind you, the defendant has

23   no burden whatsoever in this case.  The burden rests with the

24   government.

25         I will remind of you of that during my final

1    instructions, but you should always keep that in mind.

2            So you have now heard all the evidence in the case

3    that you are going to hear.  Our next order of business will

4    be to hear the closing arguments or summations from the

5    lawyers.

6            Let me explain how it works here in Federal Court.

7    The government will make a closing argument to you initially,

8    and again, in closing arguments lawyers will tell you what

9    they believe the proof has shown or perhaps what they believe

10   the proof hasn't shown.

11           After the government makes their closing argument

12   then the defense has a chance to make their closing argument.

13   Once that occurs the government gets the last word.

14           They have the burden of proof so the government can

15   make what is called a rebuttal summation.

16           What is the purpose of a rebuttal summation?  It's

17   not to make their arguments all over again.

18           It's merely meant to address arguments that may

19   have been raised for the first time in the defense closing

20   argument that the government didn't anticipate.

21           I have discussed with both sides a reasonable

22   amount of time.  We have selected forty-five minutes.  So

23   each side has forty-five minutes.

24           They don't have to use it all, but they have that

25   amount of time.

1        Now, the government has chosen to divide their time

2  fifteen -- thirty minutes for their initial argument, fifteen

3  minutes for their final argument.  Mr. Funk, of course, has

4  up to forty-five minutes.  Again, they may not use that time,

5  but they have it.

6        I mention that especially as we get to this phase

7  of the trial because I know how long -- how difficult it is

8  to listen to anybody talk let alone for forty-five minutes,

9  but it's obvious to me you've given this case careful

10  attention and I know you will extend the same courtesy to the

11  lawyers.

12        Also, since the lawyers are facing you and not

13  looking at the clock, what I will do is give them a five

14  minute warning.

15        When they get within five minutes of the end of

16  their time I will tell them as politely as I can, "Counsel,

17  you have five minutes left."

18        If they get to their allotted time, I will say,

19  "Counsel, you've reached your allotted time.  Please have a

20  seat."

21        Obviously, I want to make sure I'm fair to both

22  sides in terms of the time.

23        If that happens, don't draw any inference against

24  the lawyer who I said sit down or in favor of the opposite

25  side.

1        As I hope has become very clear by now, the lawyers
2   have enough on their mind without watching a clock.  As I
3   said, that's my job.
4        Once the arguments are done, we will kind of take
5   an appraisal of the time.  I don't know whether -- because
6   our argument went a little longer than anticipated, I don't
7   know whether it will make sense to give you the final
8   instructions today or have you come back tomorrow.
9        As I said, typically we stop about four thirty if
10  you don't reach a verdict so you can get home at a decent
11  hour.  We will have to play that by ear.
12       In terms of the government's arguments, Mr. Tyler
13  will make the initial argument to you and then Mr. Gestring
14  will have a chance to make the rebuttal.
15       We will start first with Mr. Tyler.  Please go
16  ahead.
17       MR. TYLER:  Thank you, Judge.
18       May it please the Court, counsel, ladies and
19  gentlemen:  Good morning.
20       In my opening statement at the beginning of this
21  case I told you what we would establish through the evidence
22  in this case, and I submit that you learned through the
23  testimony and the exhibits that the defendant searched for
24  and collected images of young boys engaged in sexual activity
25  amongst themselves and with adult men, and he produced videos

1     for the purpose of capturing images of the genitalia of young

2     boys including his young son, Jace.

3           In its totality the evidence establishes that the

4     defendant had a sexual interest in young boys and that he

5     acted on it.

6           As you know, the indictment charges the defendant

7     with two counts of producing or attempting to produce images

8     of a minor engaged in sexual activity and four counts of

9     possession of child pornography.

10           I want to talk first about the possession charges

11     that are set forth in counts three, four, five and six.

12           As to those counts, the possession counts, I expect

13     that Judge Siragusa will instruct you that we must prove

14     three essential elements beyond a reasonable doubt.

15           First, that on or about December 18th, 2012 the

16     defendant possessed materials that he knew contained at least

17     one image of child pornography.

18           Second, that the image or images had been shipped

19     or transported in interstate or foreign commerce; or, that

20     the image or images had been shipped or transported in

21     interstate or foreign commerce by a computer; or, that the

22     image or images had been produced using materials that had

23     been shipped or transported in interstate or foreign commerce

24     including by a computer; that at the time of the possession

25     the defendant believed that the image or images contained in

1    the materials constituted child pornography.

2              So what is the evidence that supports these

3    elements?

4              I submit that we start in August of 2012.  The

5    defendant has moved back into his home bringing computer

6    equipment, the home on Gassner Road, Waterloo, New York.

7              In December, the defendant has left the house and

8    his wife Robin Cooley asks her nephew Steven Cooley to search

9    the defendant's computer for any family photos or other items

10   that she wants to keep before she gets rid of the computer

11   equipment from the house.

12             Steve Cooley told you that he searched the black

13   tower computer and then he searched a hard drive that he

14   found on top of that black tower computer, and when he went

15   into the hard drive that he described as the Western Digital

16   hard drive he saw images, and Steven Cooley described those

17   images to you as depicting sexual activity between young boys

18   and young boys and adult men.

19             Steven Cooley shows those images to Robin Cooley.

20   Steven Cooley and Robin Cooley go to the Waterloo State

21   police.

22             They bring hard drives, but they give only one -

23   the Western Digital hard drive - to Investigator Grbic and

24   that is the hard drive charged in count three of the

25   indictment.

1          Special Agent Grbic takes the Western Digital hard
2    drive and puts it into evidence.  He takes their statements -
3    robin Cooley's and Steven Cooley's statements.

4          Investigator Grbic the next day, December 18th,
5    goes to a local Judge and gets a search warrant for the
6    residence on Gassner Road.  As you know, that search warrant
7    was executed in the evening of December 18th.

8          Robin Cooley showed Investigator Grbic her
9    husband's computer equipment in the house; that is, the hard
10   drives on the kitchen table.

11         I want to show you to remind you a photograph of --
12   showing you in evidence the photograph 5 I.

13         The items -- she showed them the defendant's desk
14   that was depicted in Government Exhibit 5 O, the black
15   computer under the desk - showing you the photograph 5 P -
16   and the plastic drawers that had the computer parts in them -
17   showing you Government Exhibit 5 U, the photograph of all the
18   drawers, and then finally showing you the photograph of the
19   top drawer which is marked as 5 V.

20         As you know, Grbic takes the hard drives, two pin
21   hole cameras and a variety of miscellaneous memory sticks
22   from the house.

23         He takes them first to Waterloo SP and then he goes
24   to Troop E Canandaigua and delivers the digital items to the
25   computer crimes unit in Canandaigua.

1          Investigator Enser told you that he did a preview

2     analysis of the Western Digital hard drive charged in count

3     three and the Seagate hard drive charged in count four of the

4     indictment, and in that preview he found images and he told

5     you that he used a tool that prevented him from altering the

6     content of either one of the drives.

7          You heard from investigator Crosier who told you

8     that she did a preview examination of the black tower

9     computer and that she used tools that would prevent her from

10    altering the contents of that computer.

11         Based upon what the images that Investigator Enser

12    found, the Department of Homeland Security was alerted and

13    agents came from Buffalo to Troop E Canandaigua and they were

14    shown a sampling of the images that Investigator Enser had

15    found in his preview.

16         The agents decide to go find the defendant and they

17    go to his parents' house in Clyde, New York.  They identify

18    themselves.  They show him their credentials and they ask if

19    they can talk to him.

20         The defendant agrees and he invites them into the

21    house and he has a conversation with the agents and he tells

22    them that they will find child pornography images on his

23    computer; that he searched the internet looking for images of

24    young boys using peer to peer software; that he was using

25    search terms such as sex and kid, sex and teen and sex and

1    preteen.

2          He told the agents that he also downloaded some

3    pictures of babies.  He told the agents that once he

4    downloaded the images of of CP he viewed them and he masturbated

5    to them.

6          The defendant further told the agents that he used

7    the pin hole cameras to record his wife abusing him and to

8    take a video of little boys jumping on a bed to show the

9    family how silly they were being.

10          Once the agents had talked to the defendant - you

11   heard from Karen Wisniewski - she went to a Federal Judge in

12   Rochester and obtained a search warrant for all the digital

13   items that had been taken by the State police.

14          Agents went to Troop E Canandaigua on January 31st,

15   2013 and they took custody of all the digital items, and as

16   you heard, they transported them to Buffalo to the Department

17   of Homeland Security laboratory, and it was there that

18   Special Agent Gillett, a computer forensic agent, told you

19   that he analyzed thirty-five items - five of which had

20   evidentiary value images on them; images that came from the

21   Western Digital hard drive that had been given to

22   Investigator Grbic, images from the Seagate hard drive from

23   the kitchen table, images from the one hundred gig hard drive

24   found on top of the black computer, images from inside the

25   hard drive -- from the hard drive inside the black tower

1    computer and images from one of the pin hole cameras.

2           Special Agent Gillett told you that on each of

3    these digital items there were markings that indicated that

4    they had been made outside the United States, and as part of

5    the evidence there are certifications from the manufacturers

6    of the digital equipment, Western Digital, Seagate and

7    SanDisk to the same effect.

8           I want to focus on Government Exhibit 62, the

9    Western Digital hard drive.

10          Special Agent Gillett told you that he found one

11   hundred twenty images and two hundred forty videos that had

12   images of minors engaged in sexually explicit conduct.

13          You were shown a sampling of these images through

14   the photographs that were marked as Government Exhibit 62 D

15   1, 3 and 6 and I'll put those on the screen before you now.

16          First, Government Exhibit 62 D 1, the photo,

17   Exhibit 62 D 3 and the photo Exhibit 62 D 6.

18          These are the images that Special Agent Brelsford

19   testified to this morning he had seized pursuant to an

20   investigation that he was involved in, a separate

21   investigation, and that he had met the young children in

22   those images in person and he determined at that time their

23   ages to be in the early teens.

24          They're real children.

25          And then you saw the images from Government Exhibit

1   F 1 and F 2 - showing you first Government Exhibit 62 F 1 and

2   then Government Exhibit 62 F 2.

3           As you recall, again, Inspector Bone told you this

4   morning that these are images that he seized pursuant to his

5   separate investigation and that he met the young individual

6   in these images, a real child again preteen in age.

7           As you view these images I submit there is no

8   reasonable doubt that they depict very young boys engaged in

9   sexually explicit conduct or sexually explicit exhibition of

10  their genitals.

11          Finally, on the Western Digital hard drive

12  Investigator - I'm sorry - Special Agent Gillett found family

13  photos and the e-mail registration in the name of Ron Spoor

14  and wiping software that he explained could be used to delete

15  the content of a hard drive.

16          Agent Gillett further testified that on the hard

17  drive specified in counts four, five and six; that is, the

18  Seagate hard drive on the kitchen table, the one hundred

19  gigabyte hard drive and the hard drive from the black tower

20  computer, he found a video that depicts the defendant with

21  two little boys who are naked.

22          And finally -- and in regard to the three hard

23  drives - these three hard drives - they have the common video

24  what I will call the camper video that is charged in count

25  one.

1          Upon seeing some of the images of that video Robin

2    Cooley identified her son Jace and gave an age approximation

3    of seven to eight years old and she identified the defendant.

4          I want to show you those images again.  First the

5    image Government Exhibit 52 F 5.  Showing you the image 52 F

6    6, F 7 and F 8.

7          I ask you to recall the testimony of Sandy Daeffler

8    who identified her son Justin from some of the images and

9    estimated his age at the time to be eight or nine years old,

10   and she had been looking at Government Exhibit 52 F 9 that I

11   put on the screen before you now and Government Exhibit 52 F

12   11.

13         Investigator Gillett told you that from one of the

14   pin hole cameras he reviewed and analyzed the four gigabyte

15   SanDisk, the microchip you saw on the screen - the little

16   microchip - and they analyzed that chip and they found two

17   video clips, one depicting the defendant placing the pin hole

18   camera in his parents' bathroom, the other video depicting

19   the defendant placing a pin hole camera in his bathroom -- in

20   his parents' bathroom to then capture the images of two young

21   boys' penises.

22         Upon being shown still images from these video

23   clips, Robin Cooley identified the defendant and then her son

24   Jace recalling this morning that the images were taken during

25   a birthday party for Jace around June, 2012 when he was ten

1   years old.

2          I'm showing you those images, 53 C 3 and 53 C 4 and

3   53 C 7.

4          Upon seeing still images from the same video clips

5   Tanya Borthwick identified the defendant and then her son Ian

6   who we can see was a very young little boy at the time.

7   Showing you the images 53 C 14 and 53 C 15.

8          Robin Spoor identified this as the bathroom of her

9   in-law parents, the defendant's parents.

10          It is the video that is aimed at the young boys'

11   penises that is charged in count two of the indictment, what

12   I will call the bathroom video.

13          As to count ones and two I expect Judge Siragusa

14   will instruct you that we must establish three elements

15   beyond a reasonable doubt.

16          First, that in or about April, 2012 in count one

17   and in or about July, 2012, count two, the defendant did

18   employ, use, persuade, induce, entice or coerce victims less

19   than eighteen years of age to take part in sexually explicit

20   conduct for the purpose of producing a visual depiction of

21   such conduct or that he attempted to do so, and that the

22   visual depiction was produced using materials that had been

23   shipped or transported in interstate or foreign commerce.

24          And you may remember that Joe Gillett told you that

25   he had taken apart the pin hole camera and he saw the foreign

1    markings with regard to manufacture.

2           As I told you in my opening statement, the images

3    and the videos - the production videos charged in counts one

4    and two - are not as graphic as those in the Western Digital

5    hard drive.

6           Mr. Funk in his opening said that he will have

7    conceded that they are not sexually explicit.

8           To the contrary, although they do not show sexual

9    contact between young boys, they depict images of very young

10   boys and in particular their genitalia.  In fact, almost only

11   their genitalia.

12          If you recall, the still images of Jace Spoor in

13   the bathroom you can't even see his head until at some point

14   he quickly bends down.

15          Robin Cooley identified Jace based upon a medical

16   condition with his penis.

17          The defendant's purpose for making this video was

18   clear.  He was intending to capture images of the young boys'

19   penises and you saw he succeeded.

20          Judge Siragusa will instruct you that you can find

21   these images sexually explicit if you find that they depict

22   lascivious exhibition of the genitalia, a conclusion I submit

23   to you will not be hard as to both videos when you consider

24   the boys are fully naked and the settings of the videos.

25          There's a bed in the camper and a bathroom.  The

1   central focus of the videos is the mid section of the boys.

2   That's the focus of the videos captured secretly using a pin

3   hole camera.

4          And finally when you consider the defendant's

5   sexual interest in young boys, you know his purpose, to

6   produce and attempt to produce the images of their genitalia.

7   It was to satisfy that sexual interest.

8          To demonstrate these points I want to show you

9   portions of the two production videos in counts one and two.

10          First, Exhibit 52, the camper video.

11   (Video played.)

12          Ladies and gentlemen, I submit to you that what you

13   saw is just not little boys completely naked.

14          What you saw at one portion of the video is that

15   Mr. Spoor picks up the camera from the counter and walks over

16   to the bed where the boys are and intentionally lifts up the

17   blanket and directs it at one of the boy's genitalia.

18          This is not a family image.  This is not a baby in

19   the bath water.  This is child exploitation.

20          If we could show Exhibit 53, the bathroom video.

21          THE COURT:  Mr. Tyler, you have five minutes left.

22          MR. TYLER:  Thank you, Judge.

23          Again, ladies and gentlemen, after you watch the

24   bathroom video which you just saw a portion of I submit to

25   you, again, just focusing or paying attention to the focal

1    point of this video, the way the defendant set up the camera

2    to capture a certain portion of any young child that came

3    into that bathroom during the course of Jace Spoor's birthday

4    party in 2012.

5           You've been very attentive during the course of the

6    trial, and on behalf of myself, Mr. Gestring and Special

7    Agent Richards I sincerely thank you for that attention.

8           I submit the evidence presented during the course

9    of this trial shows beyond a reasonable doubt that Ronald

10   Spoor knowingly possessed images of child pornography and

11   that he attempted to produce sexually explicit images of

12   young boys and that he did, in fact, do just that in regards

13   to count one and two.

14          We ask that you return the only verdict that the

15   evidence and your common sense dictates, and that is guilty

16   of each and every single count in the indictment.

17          Thank you.

18          THE COURT:  Thank you, Mr. Tyler.

19          Mr. Funk.

20          MR. FUNK:  May it please the Court, ladies and

21   gentlemen of the jury - right on the button - good afternoon.

22          I'd like to thank you for your time and attention

23   this week and last.

24          I know you get kind of pulled out of your lives and

25   kind of thrown into this and it's not lost on me that you

1    sacrificed by being here.

2              So I on behalf of Ron Spoor thank you and

3    appreciate your jury service.

4              I'm not going to bury the weed.  Let's start with

5    this and be blunt.  The first two counts allege that

6    Mr. Spoor produced child pornography; the camper video, the

7    bathroom video.

8              My argument to you is pretty simple.  Those videos

9    don't show child pornography.  So he's not guilty.

10             With regard to the possession counts, the four

11   devices - Western Digital, the Seagate, the generic hard

12   drive and the tower - I would submit to you that you heard

13   testimony that the Western Digital hard drive contains child

14   pornography.

15             But my argument to you is that he did not knowingly

16   possess that child pornography on the Western Digital hard

17   drive, and with regard to the other hard drives, again, we're

18   dealing with basically the camping video on those.

19             That's not child pornography so he is not guilty of

20   all of these counts and I'm going to explain this more, but

21   that's in summary where we're going.

22             These items, the camping video, the bathroom video

23   are not child pornography, and the child pornography that was

24   found Mr. Spoor did not knowingly possess it, and the Judge

25   is going to define all these things for you and we're going

1    to talk about them.

2           Now, one thing I want you to notice when you look

3    and hear the charges that the Judge gives you, he's charged

4    with four counts of possession of child pornography.

5           Count three deals with the Western Digital hard

6    drive.  That's Government Exhibit 62.  The fourth count deals

7    with the Seagate hard drive.  It's Government Exhibit 63.

8           The generic hard drive, count five, is Government

9    Exhibit 64 and the tower computer is Government Exhibit 65

10   which also has a Seagate hard drive in it.

11          Now, you heard that the bathroom video was found on

12   that little camera.

13          Interesting, Mr. Spoor is not charged with

14   possessing that camping -- the bathroom video.  He's not

15   charged with possessing that camera and the alleged child

16   pornography on there.

17          Think about that.  That's because it's not child

18   pornography.

19          Now, the Judge is going to explain to you what

20   child pornography is, how that definition or how those words

21   are kind of defined in the law, and you heard that somewhat,

22   but think about these words:  Sexually explicit conduct.

23          That's what makes something child pornography,

24   sexually explicit conduct.

25          Lascivious exhibition of the genitals.  Think about

1    those words, lascivious exhibition of the genitals.

2         And what you've seen on those videos that was

3    played today or played the other day - the bathroom video,

4    the camper video - I would submit to you they don't fit those

5    words.

6         Sexually explicit, they're not sexually explicit.

7         How did agent Williams - the first witness in the

8    trial - how did he testify?  How did he describe the camper

9    video?  Two naked boys jumping up and down.

10        Think about that description.  That's a pretty

11   accurate description.

12        Two boys being boys jumping around yelling and

13   screaming, that's not sexually explicit.

14        Think about just those clips that the government

15   played today.  They played maybe two minutes of that video.

16        What did you see Mr. Spoor doing and saying?

17        You know, sometimes us folks that our parents, they

18   get that kind of bored parent voice because you say things

19   over and over and over again to your kids.

20        Well, what did he say?  He kind of had that bored

21   parent voice "Jace, stop screaming" at one point right in the

22   first couple seconds of that video.

23        You heard -- and I'm sure Mr. Gestring is going to

24   try to make a big deal of this.

25        You heard the beginning of a Disney video on that

1   video and you saw Mr. Spoor putting the video in, starting

2   the movie up and Jace is jumping around.  He gets the bored

3   parent voice, "Jace, just watch the movie."

4        Not sexually explicit.  It's the bored parent

5   voice.

6        What else do you see?  Government Exhibit 52 F 5.

7   This is a popsicle.  Mr. Spoor is giving his son a popsicle.

8        And yes, we talked about it in openings, you may

9   think, wow, this is weird.  These videos are weird.  They're

10  creepy.  Mr. Spoor is a creepy guy.

11       But it's not child pornography.  Just because you

12  don't like him doesn't mean -- you can't find him guilty

13  because you don't like him and you think he's creepy and

14  weird.

15       And the government told you, well, he pointed the

16  camera at the genitals.  You saw that on that clip.  It

17  lasted less than a second.  He's got a little camera and at

18  one point for a split second it's on the boy's penis.

19       Again, think about these words:  Lascivious

20  exhibition.  Is that a lascivious exhibition?  I'd submit to

21  you it's not.

22       I would submit to you that the fact that the kids

23  are nude doesn't make this child pornography, and the Judge

24  is going to explain to you a whole bunch of factors you can

25  consider, things like the setting of the video, whether the

1   kids are like in sexual poses and things like that, whether

2   the kids are showing a willingness to engage in sex.

3          These are the definition of things the Judge is

4   going to tell you about, but think about those kinds of

5   things and think about those words, sexually explicit

6   conduct, lascivious exhibition.

7          What those factors that the Judge is going to give

8   you are basically are these erotic videos.  No.  They're kids

9   being kids.

10         Now, with regard to the bathroom video, the

11  government is saying the boys are naked.  He focused on the

12  naked boys.  He's guilty.

13         Well, you also saw an adult woman in there and he's

14  not charged with producing pornography for the adult woman.

15  There's no difference between the adult woman and the kids.

16         They're both seen naked from the waist down, but

17  he's not charged with anything about that, and they're --

18  they want you to assume that his purpose for putting that

19  camera there was to catch the little boys naked.

20         How can you assume that?  You didn't hear any facts

21  to support that assumption.

22         It's just as likely that he was trying to catch the

23  adult women that were at the party naked, and again, it might

24  be creepy; it might be weird, but you can't find him guilty

25  because of that and you can't assume stuff.

 1              So I'd submit to you when you think about those

 2      videos and when you think about the instructions the Judge is

 3      giving you, the words sexually explicit conduct, lascivious

 4      exhibition of the genitals, I think -- think about that word

 5      lascivious.

 6              What I would submit to you to take away from that

 7      is something out of the ordinary, perverted.

 8              These aren't perverted exhibition of the genitals.

 9      They're normal exhibition -- they're normal genitals.

10              What I mean by that is if a young kid walked in the

11      courtroom right now completely naked, it'd be weird; it'd be

12      unusual.  It wouldn't be pornographic.

13              So I would submit to you that there's got to be

14      something other than the fact that these kids were naked in

15      these videos to make them child pornography and there isn't

16      anything.

17              So I would submit to you that you have to find

18      Mr. Spoor not guilty of the two counts -- the first two

19      counts in the indictment.

20              Now, I'd submit to you with regard to these first

21      two counts in the indictment, you've had a reasonable doubt

22      since the very first witness in the trial, Agent Williams.

23              The Judge is going to tell you that the government

24      has to prove Mr. Spoor guilty beyond a reasonable doubt.

25      He's going to define that for you.

1          But what did Agent Williams say that I would submit

2    to you is a reasonable doubt as to Mr. Spoor's guilt?

3          You heard that on December - what was it, 21st? -

4    him and Agent Wisniewski talked to Mr. Spoor.  Now, what did

5    Mr. Spoor say during those -- that conversation about the

6    bathroom video?

7          Mr. Spoor said that was not sexual in nature or at

8    least that's what Agent Williams paraphrased what he said to

9    you.  That was not sexual in nature.

10          So I'd submit to you it's not sexually explicit.

11    It's not lascivious.

12          And how did Mr. Spoor during that conversation

13    describe the camper video?  It was just the boys being silly.

14          Now, Agent Williams testified that during that

15    conversation he did not read Mr. Spoor his Miranda warnings,

16    all that stuff you've seen on TV a number of times, the right

17    to remain silent and all that stuff, and you heard him

18    explain why he didn't do that.

19          He wasn't in custody.  He wasn't under arrest.

20          Think about that.  Why not?

21          He told you before he went out to talk to Mr. Spoor

22    he saw those videos.  He described them to you.  Yeah, two

23    boys jumping up and down, people in a bathroom.

24          He saw those videos and he didn't go there to

25    arrest Mr. Spoor because they're not child pornography.

1           Agent Williams, the first witness in the trial gave
2   you a reasonable doubt.
3           You heard before he went out there he talked to the
4   State police.  The State police had seen those videos.
5           They're not child pornography.  That's why he
6   didn't get arrested on that day.  That's why they didn't read
7   him his Miranda warnings.
8           What did they do instead?  They asked him for a
9   lunch recommendation.  Where can we go to get lunch?
10          The government hasn't proved to you that the
11  camping video and the bathroom video are child pornography
12  beyond a reasonable doubt.
13          I'd submit to you another thing that they haven't
14  proven to you.  They haven't proven to you when these were
15  created, when these videos were made.
16          That would be pretty simple, wouldn't it?  But they
17  didn't do it.
18          The camper video, count one in the indictment,
19  alleges that it was made in April of 2012, but what did you
20  hear about that?
21          Sandy Daeffler testified that she -- her son was
22  almost fourteen years old now; that she estimated that he was
23  approximately eight or nine years old when that video was
24  made, and Robin Cooley - Robin Spoor - testified that in that
25  video Jace was seven or eight.

1          He was born in 2002.  Both Jace and Justin were

2     born in 2002.

3          So you take their testimony.  Jace seven or eight.

4     Sandy said her estimate was eight or nine.  That gets you

5     2009, 2010, maybe 2011.

6          But the government's indictment - their charge - is

7     that this was April of 2012 and you didn't hear any testimony

8     to support that.

9          The Judge is going to tell you that you have to

10    determine beyond a reasonable doubt that the date doesn't

11    have to be exact, but it has to be reasonably near the date

12    alleged in the indictment.

13          2009, 2010, 2011 is nowhere near or reasonably near

14    April of 2012.

15          They can't even prove to you when it was made, and

16    the government has to prove to you beyond a reasonable doubt

17    the entire case.

18          With regard to the bathroom video, think about

19    Robin Spoor's testimony.  You heard from her on Friday.  You

20    heard from her today.

21          She completely changed her story about when this

22    video was made.  Don't you think the government realized that

23    they screwed up and they got her to come in here and change

24    her story?

25          On Friday she told you that that bathroom video

1      Jace was eight years old.  That gets us to 2010, and they're

2      saying this video was made in July of 2012 in the indictment.

3              So on Friday she says it's 2010.  Jace is eight.

4      Today she comes in, "Oh, no.  It was his tenth birthday party

5      in June of 2012."  Come on.

6              Don't you expect more from the federal government

7      than getting a witness to come in here and change their story

8      because they can't prove to you even when these videos were

9      made let alone that they're child pornography?

10             You know, we're talking about witnesses changing

11     their story.  Let's talk about Investigator Grbic.

12     Investigator Grbic had to be recalled because he was mistaken

13     about everything.

14             When he testified -- and he testified basically

15     three times.  One in the afternoon and then he came in the

16     next morning and then they had to call him later.

17             And he told you that when they were searching the

18     Gassner Road house he bagged up everything, sealed everything

19     up at the house, took it to Waterloo, put it in the property

20     clerk's office at Waterloo then the next day took it to

21     Canandaigua.

22             And then he completely changed his story.  Oh,

23     yeah.  I didn't bag it up.  I didn't seal it until I got to

24     Waterloo.  I never booked it into the property clerk at

25     Waterloo.  I just took it to Canandaigua.

1        But think about one thing he said was like
2   something to the effect of, "Oh, yeah.  My memory's getting
3   better now."  Really?
4        His memory was getting better or do you think that
5   he didn't take the precautions that the government was trying
6   to prove to you that he's supposed to take and has to take to
7   prove that these things weren't tampered with.
8        That's what all those witnesses came in for.  The
9   three troopers that were on the stand less than five minutes,
10  "Oh, I didn't tamper with anything."
11        Wisniewski, Glor, they all have to come in and say
12  this stuff wasn't tampered with.
13        You can't make that determination based on all the
14  changes in Investigator Grbic's story.
15        So let's segue to the possession counts, possession
16  counts three, four, five and six.  Counts four and six deal
17  exclusively with the camping video.
18        So as I said to you already, I submit to you that
19  that was not child pornography.  So Mr. Spoor is not guilty
20  of counts four and six.
21        With regard to count five, the generic -- what's
22  been termed the one hundred gigabyte generic hard drive, that
23  also had the camping video on it, and I've already told you
24  what I have to say about the camping video.
25        Now, there were allegations that there were

1    twenty-four videos on that hard drive, but I would submit to

2    you that you have not heard any evidence about those

3    twenty-four videos, about what their contents are, what they

4    show - nothing.

5            So I would submit to you the government has not met

6    its burden with regard to those twenty-four videos.

7            They did not show you - meaning the government -

8    did not show you any still photographs of those twenty-four

9    videos.  They didn't show those videos to you.

10           You have nothing to go on to show that this is

11   proof beyond a reasonable doubt that Mr. Spoor possessed

12   those twenty-four videos or that they contain child

13   pornography whatsoever.

14           Now, the Judge, you'll remember during jury

15   selection he I think at one point called on a volunteer and

16   said, "I'm going to ask you a trick question.  If I asked you

17   right now what your verdict was what would it be?"

18           And I can't remember who answered that, but someone

19   gave the right answer and said, "Not guilty because we

20   haven't heard any evidence to get over the alleged

21   presumption of innocence."  The Judge said, "Absolutely

22   right.  Great answer."

23           Well, you haven't heard anything to get over that

24   hurdle of the presumption of innocence regarding these

25   twenty-four videos.

1          Now, I'd submit also with regard to those

2   twenty-four videos and with regard to the child pornography

3   that was on the Western Digital hard drive that Mr. Spoor did

4   not knowingly possess those items.

5          The Judge is going to tell you what knowingly

6   means.

7          With regard to these twenty-four videos you heard

8   testimony that Agent Gillett recovered those twenty-four

9   videos from unallocated space on the computer hard drive and

10  that he needed sophisticated forensic software to do it, and

11  we talked about what the difference between allocated and

12  unallocated space is and all that and he said this is in

13  unallocated space, and he said to you that this stuff can't

14  be seen, can't be recovered without this sophisticated

15  forensic software that he used.

16         So I said -- I asked him, "The average computer

17  user wouldn't be able to get access to this stuff," and he

18  said, "No."

19         So I would submit to you that that's not knowing

20  possession on the part of Mr. Spoor.

21         Now, the Judge has repeatedly told you throughout

22  the trial that I don't have to prove to you anything.  The

23  defendant doesn't have to prove anything.

24         The defendant doesn't have the burden of proof.

25  The burden of proof is specifically and solely on the

1    government to prove Mr. Spoor guilty beyond a reasonable

2    doubt of everything alleged in the indictment, and what I'm

3    about to say doesn't change that and doesn't shift the burden

4    to me.

5              I don't have to prove this to you, but what I'm

6    going to do is submit to you a couple scenarios as to how

7    this child pornography may have got on that computer and

8    you've heard a couple things that I think are supported by

9    the evidence.

10             One is you heard that Mr. Spoor had a side job of

11   working on peoples' computers.  The other one is - the other

12   scenario - and I'm going to explain these more in a little

13   more detail is that Robin and/or Steve Cooley were

14   responsible.

15             Now, let's start with the working on the computers.

16   You heard that the Western Digital hard drive was an external

17   hard drive and you heard that it doesn't have an operating

18   system so it didn't -- wasn't capable of being used in and of

19   itself.  It had to be hooked up to something else.

20             And you heard that an external hard drive it's not

21   uncommon - and I think we talked about that - it's got a wire

22   attached to it.

23             The purpose of the wire is to hook it up to a

24   computer, and you heard one of the computer witnesses say,

25   "Yeah.  With an adapter you can hook that up to any computer

1   you want."

2          Isn't that something that someone that's fixing

3   computers might have and might use?

4          What was the purpose -- what did you hear about

5   external hard drives?  What are they used for commonly?  As a

6   back up.

7          So if you're fixing someone's computer, if you're

8   working on a computer, you put all the files on to an

9   external hard drive so if something happens when you're

10  fixing the computer all your information doesn't get

11  corrupted.

12         I think you also heard that on this Western Digital

13  hard drive there were utilities.  Utilities are things that

14  help -- that can help you fix a computer, things like -- anti

15  virus was an example I used with some of the witnesses.

16         Now, with regard to Robin and Steve, you heard

17  Steve say about his -- and Robin, we can't get any closer.

18         She has an open door policy.  He goes to visit her

19  every day or every other day.  But you heard some I think

20  significant discrepancies in what they said.

21         One was Steve was asked have you ever brought

22  computer equipment to the house, and he said no.  Robin said

23  he did.

24         And I think another significant discrepancy, Steve

25  tried to describe to you his aunt and her lack of computer

1    skills and said something like, "I don't think she even knows
2    how to turn on a computer."

3              Well, Robin Cooley testified that when Ron moved
4    back into the house in August of 2012 he brought a bunch of
5    computer stuff with him, but she had two laptops and a tower
6    all her own.

7              Does that sound like someone that can't even turn
8    on a computer or do you think Steve is covering for her?
9    Steve's covering for the aunt that he can't be any closer to.

10             And you've heard and the government said it -- Mr.
11   Tyler said it just a few minutes ago.  By the time all this
12   stuff unfolded at the end of December, 2012 Ron was out of
13   the house again.

14             You heard they got divorced in I think 2010.  He
15   was out of the house.  He came back in August.  Well, he was
16   gone.

17             Again, they tried to reconcile.  It didn't work.
18   He's out of the house.

19             Do you think there was bad blood there?  Do you
20   think there were issues that they were trying to get Ron back
21   for something maybe?  They separated.

22             Now, the government also -- I just want to throw
23   this in before I kind of wrap up this area about these two
24   scenarios.

25             The government pointed out and wants you to think

1    that this is nefarious on the part of Ron that he had peer to
2    peer software and that he had a complete -- had a cleaner
3    program on there.
4              Well, you've heard all the computer witnesses that
5    testified all said that this stuff is common.  It's not
6    unusual to have any of this stuff there.
7              Again, I think the cleaner software would be
8    something that someone would have if they're fixing
9    computers.  It's a utility.
10             Now, these two things, the working on the computer,
11   whether -- how it got there, if it was Ron was working on
12   someone's computer and saved this stuff on to the hard drive
13   when they were fixing this other person's computer or Steve
14   and/or Robin put this stuff on this hard drive, I would
15   submit to you that there's no evidence that Ron put it there.
16             The government you heard tested - examined -
17   thirty-five different separate pieces of computer equipment
18   including eighteen hard drives and they find this child
19   pornography on the Western Digital hard drive, the external
20   hard drive that's not hooked up to anything.
21             Why is that significant?
22             You would think that if Ron had downloaded this on
23   to any computer, any of the hard drives that he was working
24   on or that he had in his possession, these videos, these
25   images would be on one of the other seventeen hard drives.

1    They're not.

2              You heard from Gillett.  He's got no information as

3    to when this stuff was downloaded.  He has no information as

4    to who downloaded it.  He has no information as to what

5    devices downloaded it.

6              This is the government's evidence.  This is what

7    the government is trying to convince you is proof beyond a

8    reasonable doubt and it's not.

9              I would submit to you that that stuff got on the

10   hard drive - the Western Digital, the external hard drive -

11   because someone downloaded it on to their computer and then

12   copied it on to the external hard drive.

13             And whose computer wasn't tested?  Robin Spoor's.

14   Investigator Grbic told you flat out, "We didn't take her

15   computer."

16             They didn't take her computer.  Why not?

17             So you didn't -- so what you heard is that this

18   stuff obviously got downloaded from the internet somehow.

19             That's why I asked the one agent this morning --

20   you know, he was involved in this investigation in

21   Philadelphia.

22             So it got on the internet somehow and people all

23   around the country were downloading this.  So he's been

24   traveling around testifying around the country.

25             It got downloaded from the internet and wound up on

1    the Western Digital hard drive, the external hard drive, but

2    you haven't heard anything that said Ron did it.

3           They tested all of his items.  They tested

4    thirty-five things and none of them show he downloaded it.

5    They didn't test Robin's.

6           Now, another thing that you should consider in

7    regard to the knowing possession, I asked Agent Gillett about

8    link files and he told you what a link file was.

9           A link file is something that the computer creates

10   that if you access a photo, a video - anything - the computer

11   can automatically create a short-cut to it so if you want to

12   go back to it it doesn't take as much time and effort on the

13   computer's part to access it again.

14           Why is that important?

15           Because it's a record of when files are opened,

16   when videos are looked at, when photos are looked at, and he

17   told you he didn't examine that.

18           So what you have is you have no evidence that these

19   files were ever opened and looked at at all.  There's no link

20   files.

21           Now, you heard some things that Agent Williams

22   testified about that Mr. Spoor told him on December 21st,

23   2012 and Mr. Tyler mentioned them to you; that he supposedly

24   said that he used search terms and things like sex and teen

25   or something like that.

1            Let me ask you:  Did you hear any forensic evidence
2    to support that?

3            Did you hear Agent Gillett saying, "Yeah.  I did an
4    internet history search to find out what search terms were
5    being used"?  No, you didn't.

6            What else did Ron supposedly tell Agent Williams?
7    Let's talk about that.

8            Now I've already discussed with you that they
9    didn't read Ron his Miranda warnings during that interview,
10   and I told you why I think that is, because they couldn't
11   arrest him because the videos they saw - kids jumping on the
12   bed - weren't child pornography.

13           But what did they do?  They went to his house and
14   they questioned him, and I would submit to you what they did
15   is they kept his parents in the other room so they couldn't
16   interfere in their questioning.  So they isolated him and
17   they talked do him.

18           So they question him and they don't tell him, "You
19   have the right to remain silent" because they want him to
20   talk, and they say that he allegedly said that he would view
21   child pornography and masturbate to it.

22           Well, have you heard anything that would make that
23   possible?

24           THE COURT:  Excuse me, Mr. Funk.  You have five
25   minutes left.

1          MR. FUNK:  Thank you, Judge.

2          Let me show you Government Exhibit 5 G.  This is

3    the home on Gassner Road.  Here's the living area, chairs,

4    couch.  Here's the computer desk.

5          Now, does the government want you to believe that

6    Ron is sitting at that desk watching child pornography and

7    masturbating where the family's sitting watching TV?

8          It's an open space.  That's what Robin Spoor said.

9    No.  It's just one big room.

10         So I would submit to you that the fact that this

11   stuff was on this hard drive, it's not being hidden.  It's

12   sitting there.

13         What does -- Steve Cooley, if you believe his

14   testimony, this external hard drive is sitting right on top

15   of the tower.  Ron doesn't have it squirreled away like he's

16   hiding it because he doesn't know it's there.

17         He doesn't knowingly possess child pornography.

18         The last thing I'll leave you with, ladies and

19   gentlemen, is the government has done some things during the

20   course of the trial to kind of try to get you to just think

21   that Ron's a bad guy, that you shouldn't like him.

22         Well, you don't need to like him, but you have to

23   give him a fair trial.

24         And one thing Mr. Tyler pointed out in regard to

25   the statement with Agent Williams, they threw out during his

1      testimony, oh, he downloaded pictures of babies.

2                Well, what does that mean?

3                How many of you have been on the internet and

4      haven't seen the cute baby video, cats running around, stuff

5      like that?

6                They're trying to twist that.  You didn't hear any

7      testimony about what these baby videos were or baby pictures.

8                They just threw that out there to make you think

9      Ron's a bad guy, and you may think he's weird.  You may think

10     he's creepy, but he's not guilty.

11               I started my opening back here with Ron telling you

12     that he was an innocent man.  Well, guess what?  He still is.

13               He still is an innocent man and the government

14     hasn't proven to you beyond a reasonable doubt that he's

15     guilty.

16               So when you're done deliberating, come back with a

17     verdict of not guilty on all six counts.

18               Thank you.

19               THE COURT:  Thank you very much, Mr. Funk.

20               Mr. Gestring.

21               MR. GESTRING:  Thank you, Judge.  If I could have

22     one minute to set up.

23               THE COURT:  Yes.

24               MR. GESTRING:  Folks, I agree with what Mr. Funk

25     said.  By that I mean I think that you need to consider what

 1  the defendant was doing and what the defendant was saying in

 2  figuring out whether he's guilty of the six counts that he's

 3  been indicted for.

 4          And what he was doing was downloading images of

 5  child pornography, using child pornography specific search

 6  terms, using IRC chat rooms, using peer to peer software,

 7  looking at the stuff he downloaded and then masturbating to

 8  it.

 9          That's what he was doing.

10          And let's talk about how we know that.  I guess

11  I'll start with Mr. Funk's premise that the internet did it.

12  Basically it wasn't Mr. Spoor, but it was the internet so we

13  should really be prosecuting the internet for these crimes.

14          Well, he did, in fact, according to the evidence

15  that was put forth today and during the course of the trial,

16  there was some evidence that Mr. Spoor worked on other

17  peoples' computers, but let's put all that aside.

18          Let's put the whole Robin did it, the whole Steve

19  Cooley did it.  The person who admitted to doing it is him

20  right there.

21          This is not a who done it.  It's a he done it.

22          And we started with his admissions for a reason,

23  because those were his admissions.  He admitted doing that.

24          They didn't water board him.  They didn't torture

25  him.  You just heard that he was separated from his parents.

1   He's a grown man in his own kitchen.  He was not under

2   arrest.  The agents didn't have guns out.

3           They didn't Mirandize him because as the Judge will

4   instruct you they don't need to.  They also didn't read him a

5   Wegmans catalog or the phone book because they didn't need to

6   do that.

7           It was a conversation.  It was a consensual, low

8   key conversation and he admitted to doing those things.  He

9   admitted to there being child pornography on his stuff.

10          Well, folks, that's knowing.  That is right there.

11  That's the possession counts.  He knew there was material on

12  there.  He admitted to searching for it.  It didn't happen

13  accidentally.

14          Even assuming he got the drive from somebody else

15  and said, "By heck, I'm repairing a computer.  I found this

16  hard drive in my work.  I looked and I happened to find child

17  pornography.  By heck, what should I do with this?"

18          That's not what the evidence was.  The evidence was

19  he deliberately sought out images of child pornography and

20  viewed them.

21          And think about what he did to them because that's

22  important and we'll get back to that in a minute.

23          Those admissions, folks, the IRCs, the peer to peer

24  software and the specific search terms, that's knowing

25  possession.

1          Remember what he did when he got these videos?  He

2     wasn't -- he didn't tell the agents he was horrified.

3          He didn't tell the agents, "I accidentally got a

4     hard drive from somebody.  I found images.  I didn't know

5     what to do with them."

6          Robin and Steve knew what to do with them.  They

7     immediately brought them to the State police because they

8     knew how wrong those images were.  They knew how horrific

9     those images were.

10         Steven Cooley -- Steve Cooley, big strong guy works

11    in trash hauling stuff all day long.  Recall the impact they

12    had on him even to this day.

13         Those are the images that that man sought out,

14    looked for and then he masturbated to them.

15         And why is that important?  Because it shows that

16    he -- there's a sexual component to this, to what he did, to

17    these images and to this whole case, and there has been from

18    the beginning and there remains through to the end.

19         Mr. Funk would like you to think about the absence

20    of link files.  We don't need link files.  We have his

21    admissions.  We have human link files right there.

22         But the fact that there's a sexual interest in

23    young boys supplies the motive for those two videos, the

24    camper video and the bathroom video.

25         Now, think about -- and you'll have an opportunity

 1  if you want to see them again.  You saw some still images.
 2  You'll see some other parts to that.
 3          It was described by the defense as boys being boys.
 4  It may have been had it just been kids being kids.
 5          This is something funny and I take the camera out -
 6  the family camera - take some pictures and send them to
 7  somebody, "Look.  These kids are being goofy."
 8          If that was all that was on this, we would be in a
 9  different posture right now, might be in a different place.
10  That is not what is on those things.
11          There is no - no, no, no - explanation for picking
12  up a camera which you've hidden there, walking over to two
13  boys who you know are naked - one of them is your own son -
14  and then picking up this little pin hole camera, lifting the
15  blanket like you saw in the video and putting the camera down
16  not to capture feet, not to capture elbows, not to capture
17  something that was on the bed.
18          It was aimed at the little boys' penises because
19  really that's what this is.  This is a penis cam.  Right?
20          MR. FUNK:  Objection.
21          THE COURT:  Sustained.
22          MR. GESTRING:  That's what he used this for.
23          He used this repeatedly to look at little boys'
24  penises, his own son, Ian, and he also looked at another
25  penis.

1          Think about that.  Think about Justin.  Okay?

2    That's what he used this camera for.

3          It stopped being about silly kids playing on a bed

4    when he picked up that blanket and stuck the camera

5    underneath it.

6          Are the kids naked?  Absolutely.

7          Let's talk about the fact that it was a hidden

8    camera.  Again, it's not like he put something up there,

9    noticed the kids being silly and said, "Let me take out my

10   cell phone or let me take out the family Kodak and take a

11   picture."

12         He put this little camera - this tiny, tiny

13   camera - he hid this -- I'm putting my pen next to it so you

14   can recall how small that camera is.

15         He hid this on there before any of the kids got

16   silly, before any of the naked kids played around.

17         He intended on capturing them naked.  When he

18   didn't capture enough stuff he picked it up and he took it

19   and he wanted to make sure he got that shot and he stuck it

20   under the blanket.

21         There is no other explanation for that shot and

22   that shot proves the production and the intent on the

23   production.

24         Where was it aimed?  At a little boy's penis.  What

25   did he do with it once he made this recording?  He saved it.

1   Okay?

2          The bathroom video was only on the camera.  Where

3   was the camper video?  On three other devices.  How did it

4   get there?

5          Is it something where you just hold the camera near

6   the hard drive and a magic trick we move the image over?  No,

7   you have to deliberately move something across to put it on

8   to one of these drives.

9          He did that not one, not twice, but three times.

10          Why did he do that?  Because we value the things we

11   make the most and he made that video - not to show the little

12   boys jumping on the bed, but he made it because he wanted to

13   show naked little boys, and that's exactly what he did,

14   folks, and that's what the video shows.

15          We talked about again not silly kids jumping on the

16   bed because the facts are inconsistent with that.  He didn't

17   start the camera after the fact.  He hid it before the fact.

18          Let's talk about the bathroom video.

19          Again, as Mr. Tyler said, I think the defense

20   incorrectly suggests we concede that's not child pornography

21   because it is.

22          You say in our complaint we didn't charge him with

23   enough?  That's the argument - we didn't charge enough

24   counts.  We need to charge him with possession of this as

25   well in addition to producing it?

1          I submit, ladies and gentlemen, when somebody - an
2    adult - secretly installs a tiny pin hole camera in the
3    bathroom and when they aim it specifically at little boys'
4    penises -- think about that event, a little boy's birthday
5    party.
6          Who was the intended target?  Where was the focal
7    point?
8          Because the defenses kept talking about sexually
9    explicit conduct, sexually explicit conduct and lascivious.
10         What is lascivious?  The Judge will tell you that.
11   We're not going to tell you that.  The Judge will tell you
12   that.
13         One of the things the Judge will tell you, you need
14   to consider what the focal point of that camera is.
15         The example used what if a naked boy walked into
16   this courtroom, is that child pornography?  Probably not.
17         If I pick up a camera, walk over to that boy and
18   hold that camera right up to his penis, yes, it is, because
19   you look at the focal point.
20         What is the purpose of that image?  What is the
21   focal point of that camera?  Really?
22         You think this camera was placed to catch an old
23   lady on the toilet?  If so, it was the worst possible angle,
24   but it did manage to capture the little boys' penises because
25   that's where it was aimed.

1        Look at what you can see in that camera.  Look at

2   what you can see in that video.

3        Can you see any of the little kids' heads?  No.

4   Can you see the shoulders?  No.  You can see the area that

5   he's interested in.  The penis, the genitalia.

6        The only way we know that it was Ian in there is

7   because at one point he bent over to pick up his bathing

8   suit.

9        There's no other point of where that camera is

10  aimed.  It's aimed at exactly what he captured because,

11  again, that's what he's interested in.

12       Remember, in the context he's sexually interested

13  in little boys.  So what is he taking pictures of?  Little

14  boys' sexual areas.  I talked about the pin hole camera.

15       There's some question about whether Robin and Steve

16  Cooley set him up.  It was suggested maybe they planted this

17  somehow and there was even some questions during the

18  testimony, well, that drive was sitting next to Robin on the

19  table so it's obvious she did her Jedi mind trick and put

20  child pornography on there.  That's ludicrous.

21       There is one explanation that works here.  The man

22  who said there's child pornography on here, who admitted

23  there's child pornography on there is the one who put it on

24  there.

25       The fact that there's other devices that don't have

1    child pornography on it, if this is really a set up, why

2    wouldn't they put it on all of them?  Because it's not a set

3    up.  It's his work.

4              Now, the drive that was sitting on top of the

5    computer that had the stuff - the Western Digital drive - he

6    wasn't in the house at the time when they executed the search

7    warrant.

8              THE COURT:  Mr. Gestring, you have five minutes

9    left.

10             MR. GESTRING:  Thank you.

11             Maybe he left it there.  Maybe he didn't remember

12   he left it there.  It doesn't change the fact that drive was

13   on there.

14             That drive was looked at.  You saw what Steve

15   Cooley's reactions and response was.

16             They didn't take Robin's computers.  You know what?

17             The feds you see -- during the course of this trial

18   I think you saw there's a difference between federal and

19   State law enforcement.

20             A search warrant probably would have taken all the

21   computers.

22             MR. FUNK:  Objection.

23             THE COURT:  Sustained.

24             MR. GESTRING:  The state didn't -- why didn't they

25   take Robin's computers?  Because they didn't admit to

 1   downloading child pornography on them.

 2           She gave them the stuff she saw child pornography

 3   on.

 4           MR. FUNK:  I'd object.  It's a complete

 5   mischaracterization.

 6           The search warrant was done before the statements

 7   were made.  It's a mischaracterization.

 8           THE COURT:  Sustained.

 9           MR. GESTRING:  Again, it seems the defense is

10   complaining because we didn't arrest Mr. Spoor fast enough

11   and we didn't charge him with enough crimes because why

12   didn't we arrest him on December 21st.

13           Folks, you remember when the HSI agents went to

14   talk to Mrs. Spoor?  They didn't have the federal search

15   warrant yet.  They didn't take custody of this stuff

16   federally until January.  That's why they didn't arrest him.

17           The fact they didn't arrest him earlier, had we

18   arrested him earlier his argument now would be you arrested

19   him too quickly.  You didn't do a full investigation.

20           MR. FUNK:  Objection.

21           THE COURT:  Sustained.

22           Let me remind you of something, folks.  I told you

23   this at the beginning.  I don't know if you recall, but I'll

24   remind you.

25           The comments of counsel aren't evidence.  The

1    evidence upon which you will ultimately make your decision

2    will consist of the testimony of the witnesses here in Court

3    and the exhibits received in evidence.

4            Mr. Gestring, go ahead.

5            MR. GESTRING:   Thank you, Judge.

6            There's some discussion about the dates and the --

7    the dates on the files.

8            Folks, go back to your recollection.   Think about

9    what the parents said approximately how old their children

10   were.   Work through that on your own.

11           The Judge will instruct you that when the videos

12   were made is not an element.   He'll tell you -- give an

13   instruction on approximately on or about what that means.   I

14   ask that you consider that as well.

15           Finally, folks, the chain of custody.   There has

16   been no evidence that anybody has tampered with any of those

17   items.

18           Granted, there was a rocky road part of that, but

19   there's been no evidence that anybody added anything, took

20   anything off or did anything from the time those things were

21   seized from the defendant's home.

22           Ladies and gentlemen, all these items prove that

23   the defendant looked for, sought out, searched for, obtained

24   masturbating material with child pornography in it.

25           That is the evidence before you, ladies and

1    gentlemen, and it shows a clear sexual interest in little

2    boys, a theme which goes throughout this entire case.  It's

3    little boys.

4           Who do we have in videos, naked little boys in the

5    camper?  Where does he put the blanket?  Capture naked little

6    boys.  The bathroom video, naked little boys.  Child

7    pornography - naked little boys - and these are real

8    children.

9           You heard from Agents Brelsford and Inspector Bone.

10   These are real children.  You heard from three mothers who

11   came in and identified their real children, including the

12   defendant's own son.

13          Folks, go back to the jury room.  When you consider

14   all the evidence, consider the facts, apply them to the law

15   as the Judge instructs you.

16          I ask you to look at everything and you'll find the

17   defendant guilty of producing child pornography for count

18   one, guilty for producing child pornography for count two,

19   and then guilty of four counts of possessing child

20   pornography, because that is what he did.

21          Thank you.

22          THE COURT:  Thank you, Mr. Gestring.

23          Ladies and gentlemen, I had hoped we were going to

24   get the case to you today.  I think it makes the most sense

25   to recess now.

1              We have some issues to deal with and then I will

2    instruct you on the law tomorrow and you'll commence your

3    deliberations then.  I think that makes the most sense.

4              Again, I reminded you last week and I'll remind you

5    again, how long you deliberate is up to you.

6              As I will explain to you in much more detail

7    tomorrow, your responsibility is to give full and fair

8    consideration to all the issues and the evidence before you.

9              Would it be possible to begin at quarter to nine

10   tomorrow, maybe fifteen minutes early; is that doable?

11             Would any one not be able to get here at quarter to

12   nine?

13             JUROR:  I'm probably the one that would be the

14   toughest because I'm the farthest away.  It all depends on

15   the weather.

16             THE COURT:  That is always a given.  That is always

17   a given.

18             I told you if the weather gets bad, call in and

19   we'll adjust it.  Let's plan on beginning tomorrow at eight

20   forty-five.

21             What we're going to do first thing when you come

22   in, Ms. Allen will take your lunch order.  We will feed you

23   tomorrow.  You can order anything on the menu from the

24   Galleria.  We will have that for you around noon.

25             How long you deliberate is strictly up to you.

1            Please keep in mind the admonitions I've given you.

2     Don't discuss the case among yourselves or with any one.

3            If any one does try to talk to you about the case

4     or does anything you think is improper please bring that to

5     my attention.

6            Avoid any contact with counsel, witnesses or any

7     one connected with this case.  In the unlikely event that

8     anything appears in the media - I haven't noticed any

9     reporters - don't pay any attention to it.

10           Don't conduct any investigation or do any research

11    on your own and please keep an open mind until the case is

12    finally submitted to you.

13           With those reminders we will excuse you.  Please

14    drive home carefully.

15           Again, remember to park somewhere tomorrow where

16    you can get your keys at any time and let your spouses and

17    significant others know you may run later tomorrow.

18           With those reminders the jury is excused.  Court,

19    however, will remain in session.

20           Thank you very much.

21    (Jury not present.)

22           THE COURT:  Counsel, the reason I didn't charge the

23    jury is because there are still some issues outstanding.  One

24    is the time.

25           I have found the judgment of acquittal would have

1    been inappropriate on the theory Mr. Funk advanced based on

2    my conclusion that a reasonable jury could find based on the

3    testimony that the dates charged in the indictment that the

4    acts occurred within the dates charged in the indictment or

5    they are reasonably close.

6           I still am left with the possibility that if the

7    jury comes back and says, "Judge, what do we do if we find

8    the events charged in count one occurred in 2010 what we do?"

9           I have done some research.  Here's what I could

10   find:  This is Sixth Circuit United States versus Manning,

11   132 Fed. 3rd 339.

12          It says, first, there is no strict rule as to when

13   two dates cease to being reasonably close -- reasonably near

14   to one another.  There's no strict rule as to when two dates

15   cease to being reasonably near to one another.

16          A five month differential between the indictment

17   time frame and the defendant's November 27th arrest is by

18   Sixth Circuit standards too great to qualify as a variance.

19          United States versus Sane - this is an Eastern

20   District case - it seems to me that four days earlier is

21   reasonably close.

22          The government is not required to prove the

23   conspiracy alleged in count nine began at the exact time

24   stated in the indictment so long as the dates reasonably

25   close in time are proven.

1              There's a Sixth Circuit case at -- in order to

2    obtain a reversal of a conviction between variance of the

3    indictment evidence produced at testimony -- two prong

4    testimony, variance must affect substantial right of the

5    defendant.

6              So I want to be ready in case the jury comes back

7    and says, "What do we do" -- since that argument was made by

8    Mr. Funk, "What do we do if we find that count one occurred

9    in 2010 based on the testimony?"

10             So submit to me whatever you want.

11             The second issue that I think we need to be

12   prepared for based on the summation is are we prepared to

13   play the hard drive?

14             Do we have the equipment to --

15             MR. TYLER:  Mechanically?

16             THE COURT:  Mechanically because Mr. Funk put out

17   there -- I suspect the jury might ask me can we see the -- if

18   they ask about the twenty-four videos can we -- it's in

19   evidence.

20             MR. TYLER:  Yes, Judge.

21             THE COURT:  They're entitled to see them.

22             MR. TYLER:  I think we'll have that capability by

23   tomorrow morning.

24             THE COURT:  We need to have that capability ready.

25             What are the numbers of the CDs?  There's two CDs

1   that photos were taken from.

2          MR. GESTRING:  Judge, those are not the

3   twenty-four.

4          THE COURT:  No.  I know that.  What are their

5   numbers because -- one of the things I will do is I will tell

6   the jury that they can request anything they want.

7          They can request all the exhibits, some of the

8   exhibits.  However, if they request certain exhibits we have

9   to come to Court to play them.

10          So we have the two CDs in, correct?

11          MR. GESTRING:  I'm looking now on the evidence

12   list.

13          Judge, we have 52 is the one video.  53 is the --

14   I'm sorry.  52 is the camper video.  53 is the bathroom

15   video.

16          62 A is the thumb drive with all of the images from

17   the Western Digital.

18          THE COURT:  So we had a series of 52 A 1 through --

19   do we have --

20          MR. GESTRING:  62 C is the digital copies of the

21   Dalmation images.  62 E are the digital copies of the Mikael

22   videos.

23          THE COURT:  So we have -- I'm trying to figure out

24   what digital images we have.

25          We have pictures in with respect to the video 52,

1  with respect to the video 53 and with respect to the video 62

2  A; is that correct?

3          MR. GESTRING:  Yes, Judge.  Some of them.

4          THE COURT:  Right.  What I need to tell the jury is

5  that they can examine any exhibits in evidence.  However, if

6  they wish to see any of the videos 52, 53, 62 A we need to

7  return to Court to do it.

8          They may not, but again, I want to be ready in the

9  event they do.

10          I suspect they may ask for -- Mr. Tyler, what do we

11  have -- what do you have to do if they do ask for -- the one

12  hundred gigabyte hard drive, what number is that, 64?

13          MR. GESTRING:  Judge, I believe upstairs in our

14  vault we have a disk that has those.  It's like a CD that has

15  those items on them.

16          THE COURT:  Which the CD isn't in evidence.

17          One of the things, Mr. Funk, that I would ask you

18  to do is if they ask - and again, you -- you know, you made

19  that point in your summation.

20          They haven't -- there was no evidence of the

21  twenty-four videos.  Since the CD isn't in evidence, you

22  know, if you're satisfied because the CD is the same as the

23  hard drive -- I take it we can't show the hard drive here in

24  Court?

25          MR. GESTRING:  Judge, I believe not without Agent

1    Gillett coming in and mounting it into some forensic system.

2              I'll check with him today and find out.

3              THE COURT:  Have you provided Mr. Funk a copy of

4    the CD of the twenty-four videos?

5              MR. GESTRING:  Mr. Funk has all the digital

6    materials and he has had access to Agent Gillett's reviews,

7    his forensic extractions as well as the original material

8    which he had an expert review.

9              THE COURT:  If they ask for them how can we do it

10   without wasting a lot of time?

11             MR. FUNK:  I understand, Judge.  I can't

12   specifically answer whether Mr. Grant specifically saw those

13   twenty-four videos, all of them or some of them.

14             I know I have spoken with him about the images in

15   general.

16             THE COURT:  Here's what I would ask counsel to do

17   then:  You guys get together this afternoon and figure out if

18   they ask for those videos how we can present them to them in

19   the easiest fashion.

20             Secondly, if you get to me just your thoughts by

21   e-mail of what the correct approach is if the jury says we

22   found -- we find -- they appeared to be listening honestly to

23   both summations very intently.

24             If they go off, "Oh well" -- because I'm going to

25   charge them that the -- while on or about language doesn't

1    mean it has to be exactly on those dates and can be

2    reasonably close, they may well come back based on the

3    testimony of Ms. Cooley and Ms. Daeffler and say we find --

4    what do we do if we find the incidents occurred in 2011 or

5    2010?

6            So I'd ask for your thoughts on that again so we're

7    ready.  Other than that we will be good to go at eight

8    forty-five.

9            I will look at those issue too this afternoon.

10           MR. TYLER:  Thank you, Judge.

11           MR. FUNK:  Thank you, Judge.

12

13                    *             *             *

14

15                    REPORTER CERTIFICATE

16

17       I, John M. DiMartino, CSR, RPR, do hereby certify that I

18   did report in stenotype machine shorthand the proceedings held

19   in the above-entitled matter.

20

21                    S/John M. DiMartino

22                    _____

23                    John M. DiMartino, CSR, RPR

24

25